## DAVIS, Agent, v. McCREE.

### (Circuit Court of Appeals, Sixth Circuit. May 8, 1924.)

#### No. 3978.

**1. Carriers ⊜⇒320(21)—Evidence held to require submission to the jury of the issue of wanton negligence of a railroad engineer, who ran into a train ahead.**

Evidence that the engineer of a railroad train at night had not slept for 23 hours, that he passed and saw block signals showing that there was a train ahead, that he became drowsy and, without warning his fireman, fell asleep, and his train, passing a brakeman who had been sent back and who signaled him to stop, crashed at full speed into the train ahead which was standing at a station, tended to show such a reckless disregard of duty by the engineer as amounted to wanton negligence, and required submission of that issue to the jury.

**2. Carriers ⊜⇒317(8)—Evidence held admissible on issue of wanton negligence.**

While a railroad company is not liable for torts of its servants not occurring in the course of the service, where the engineer of a train fell asleep and his train collided with one ahead, evidence that, from whatever cause, he had not slept for 23 hours before collision was admissible as bearing on the issue whether his conduct was reckless or merely negligent.

**3. Witnesses ⊜⇒393(1)—Permitting contradictory testimony given by a witness in a prior proceeding to be read to jury held not error.**

Where a witness had given testimony which was inconsistent with his testimony in a prior proceeding, it was not error to permit his previous testimony to be read to the jury.

**4. Railroads ⊜⇒5½, New, vol. 6A Key-No. Series—Government liable for torts of servants operating railroad under federal control.**

Under Federal Control Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), authorizing suits against railroads while under federal control, and providing that in such suits no defense shall be made "upon the ground that the carrier is an instrumentality or agency of the federal government," it is intended that the government shall be liable for the torts of its servants in operating the railroads, and that the usual rules of tort liability shall apply.

**5. Railroads ⊜⇒5½, New, vol. 6A Key-No. Series—Government's liability for torts extends to all usual operations during federal control.**

That a railroad under federal control was moving a circus train under a contract, and not as common carrier, *held* not to relieve the government from liability, under Federal Control Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), for injury to persons on such train in collision resulting from the wanton negligence of those operating another train.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Action at law by Hettie McCree against James C. Davis, as Agent, etc. Judgment for plaintiff, and defendant brings error. Affirmed. See, also, 280 Fed. 959.

Alexander L. Smith, of Toledo, Ohio (Potter & Carroll, of Toledo, Ohio, and J. Walter Dohany and Frank E. Robson, both of Detroit, Mich., on the brief), for plaintiff in error.

H. W. Fraser and Percy R. Taylor, both of Toledo, Ohio (Marshall & Fraser, of Toledo, Ohio, on the brief), for defendant in error.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

MACK, Circuit Judge. This case is before us, for the second time, on writ of error from a judgment rendered against the defendant (plaintiff in error) for $100,000 at the second trial in a suit for damages for extremely serious personal injuries sustained by the plaintiff (defendant in error) in a railway wreck at Ivanhoe, Ind., on June 22, 1918. At the time the railways were under federal control because of the war emergency. Plaintiff earned her livelihood as a circus performer, and was being carried in the Hagenbeck-Wallace circus train at the time of the collision. The circus company had a contract with the Michigan Central Railroad Company for the carriage of its performers and equipment. On writ of error from a judgment on a directed verdict for defendant at the first trial, we held that the railway company was thereby exempted from all damages to persons and property of the employés of the circus company caused by the *ordinary* negligence of any of the employés of the railway company, whether employed on the circus train or elsewhere on the railway, and that plaintiff, having accepted transportation under the contract, was bound by its terms, irrespective of the validity or nonvalidity of another contract between the plaintiff and the circus company purporting to release the circus company and the railway company from any liability for the negligence of the employés of the circus company or of any railway company engaged in transporting the circus. We held, however, that the carrier would be liable if the collision were caused by the *wanton or willful* negligence of any employé of the railway company, not engaged in the movement of the circus train, who could not, under any interpretation of the contract between the circus company and the railway company, be regarded as an employé of the circus company. We further held that there was sufficient evidence in the record of such wanton or willful negligence as to require the submission of this question to the jury. The direction of a verdict in favor of the defendant at the first trial was adjudged to be error, and a new trial was in consequence ordered. McCree v. Davis (C. C. A.) 280 Fed. 959.

[1] The facts regarding the collision were briefly these: The circus train, westward bound, en route from Michigan City to Hammond, Ind., approached Ivanhoe Tower shortly before 4 a. m., where it stopped on account of a hot box. The circus train was followed by another train, also westward bound, consisting of some 20 Pullman coaches

to be used for the movement of troops, referred to as the troop train. When the circus train stopped, the rear brakeman procured a couple of fusees and walked back (eastwards) along the track 200 or 300 hundred feet. Uncertain from the sound of the exhaust of the troop train whether or not it was on the same track, and unable to see the headlight because of a sharp curve in the road, he continued walking back until he discovered that it was on the main track, the same track as the circus train. As it was not stopping or slowing down, he ran back several hundred feet more, swinging a lighted fusee several times across the track. As this produced no effect, and as the train was almost upon him, he stepped aside, throwing the lighted fusee at the window of the engine cab. This, too, availed nothing. The troop train, proceeding with speed unchecked, collided with the rear of the circus train, breaking up four or five of the latter's cars. Plaintiff received extraordinarily severe injuries, crippling her for life.

The railway in the vicinity of the collision was equipped with block signals which worked automatically. The troop train, in colliding, had run by a red or danger signal three-quarters of a mile east of the spot where the circus train had stopped, and a yellow or cautionary signal farther east of the red signal. The testimony showed that Sargent, the engineer of the troop train, who had a long and good record, had arisen about 5 a. m. on the morning of June 21st, the day before the accident, and had traveled from his home at Jackson, Mich., to Kalamazoo, where he arrived about 9 o'clock. Shortly thereafter he was told that he would take a train of dead equipment west; at 3 o'clock, as he was going to his room, he was informed that his train would not be in before 6. As his train was not at the roundhouse at 6, he again returned to his room, stopping on the way to buy food for his supper. About 8 o'clock he was informed by the call boy that his train would be ready at 10 o'clock, about which time he did take the troop train out.

The troop train reached Michigan City about 3 a. m. June 22d. Some time after leaving Michigan City, and while approaching East Gary, Sargent observed a yellow, and further ahead a red, signal which informed him of the nearness of some train ahead. He then slowed down and took water at East Gary. After passing Tolleston, he observed a green or clear block signal ahead. He then closed the cab window, because he felt too cool. Right after this he noticed that it became very hot; he began to perspire and everything became a blank. He knew nothing further until a moment before the collision, too late to avert it. Just before the collision the fireman discovered him unconscious or asleep. The evidence tends clearly to show that he had fallen asleep. He had had no sleep for 23 hours preceding the accident, and comparatively little complete rest. Counsel for the respective parties differ in their contentions as to whether he had had any real opportunity for sleep and quiet, and whether he should reasonably have foreseen early enough to take precautions that he was to be deprived of so much sleep, owing to the uncertainty of his schedule.

Notwithstanding our earlier holding that on plaintiff's evidence alone submission to the jury of the issue of willful or wanton negligence was essential, defendant renews its contrary contention on substantially

the same evidence, supplemented on the second trial by defendant's evidence as above narrated. We cannot, however, consider this contention without reversing our earlier decision; if plaintiff's case at the first trial required such submission, substantially the same case at the second trial necessarily required it, even if defendant's evidence had tended to contradict plaintiff's version of the facts; the jury, not the trial judge, and a fortiori not an appellate tribunal, must determine the issue. But here there was no such contradiction. The trial judge in directing the original verdict had stated that he necessarily inferred that the engineer was asleep, or in a profound condition of absent-mindedness equivalent to sleep, as it could scarcely be believed that an engineer wide awake and at his post would have deliberately passed the block signals. The evidence deduced at the second trial tends to show that the engineer, for reasons good or bad, had not had sufficient sleep before undertaking the run, that he knew that another train was probably on the same track not far ahead, that he closed his cab window and was conscious of the stuffy condition of the cab before losing consciousness completely, that he gave no warning to the fireman or anyone else of his condition, that he fell asleep because of drowsiness and the want of air, and not, as at one time contended, because of any sudden indisposition. Under our former decision, to which we adhere, the issue of wanton or willful negligence was therefore properly submitted to the jury.

There was of course no willful negligence in the sense of a deliberate intention to disregard all proper precautions and to let the train run on as it would without the engineer's control. But there was, or at least there was evidence justifying a finding that there was, an utterly reckless disregard of the duty imposed upon a railroad engineer, especially in the circumstances. His knowledge that he himself was in a more than ordinary fatigued condition, likely on slight provocation to fall asleep, his further knowledge of the nearness of some, perhaps a passenger, train, made his action in closing the window or in keeping it closed more than mere negligence; it might well be deemed to be such recklessness as to come within the designation of wanton negligence.

[2] The objections to the court's charge center about the contention that there was no evidence of wanton negligence, in the absence of evidence that the engineer, just prior to the accident, saw the danger signal and deliberately ignored it. The rule laid down by this court in the previous decision cannot, however, be so narrowly restricted in view of the record then before it; it suffices that the various circumstances leading up to the collision could reasonably be deemed such as, singly or collectively, indicate a reckless disregard on the part of the engineer of his duty in the premises. Nor was it error for the court below to permit the jury to consider the fact that the engineer had had no sleep for a long period prior to taking out the troop train. It is true that the railroad is not liable for torts of its servants not occurring in the course of the service. But such acts and circumstances preceding the service may none the less, as we have heretofore shown, have a bearing on whether the conduct in the course of service is reckless or merely negligent.

299 F.—10

Error is alleged in the exclusion of the deposition of witness Johnson, an employé of the railway. His deposition had been taken by the plaintiff, who later decided not to use it. It was admitted to be of no importance and to be covered by the testimony of other witnesses. The trial judge thought that, if the railway wanted to have Johnson's testimony, it should have called him. Whether or not this was technically correct, clearly the exclusion of the deposition was not prejudicial.

[3] Nor was there any prejudicial error in allowing all the testimony given by the engineer, Sargent, in a criminal proceeding against him, to be read in evidence. He had testified in the instant case that he was suddenly overcome by illness and had become unconscious; further, that his testimony given in the criminal case was true. Plaintiff thereafter endeavored to show by specific questions that he had not so testified in the criminal case; to establish the negative, it was proper, in the circumstances, to admit his entire testimony; that testimony was to the effect that he had fallen asleep, and contained no intimation of illness as a cause of the unconscious condition.

Defendant alleges inconsistency in the jury's answers to special interrogatories, the one finding the engineer guilty of wanton negligence, the other of negligence. The latter interrogatory was requested by the defendant. A juror asked whether negligence as therein used means only ordinary negligence. Counsel for the defendant explained that he desired a finding as to whether or not it was a pure accident, with no negligence. Clearly there is no inconsistency in finding wanton negligence, and also in negativing an accident without any negligence.

[4] It is further alleged to be contrary to public law and public policy for the Director General, acting in behalf of the government, to be held responsible for the wanton negligence of an employé in a case of this kind. With this contention we cannot agree. There is no question in this case of exemplary or punitive damages or of a penalty of any kind. There is solely a question of ordinary civil liability to redress a tort of a servant, committed in the course of the service. It is therefore to be distinguished from Railroad Co. v. Ault, 256 U. S. 554, 41 Sup. Ct. 593, 65 L. Ed. 1087 It is also to be distinguished from Du Pont v. Davis, 44 Sup. Ct. 364, 68 L. Ed. ——, decided by the United States Supreme Court on April 7, 1924, in that the Du Pont Case involved the special procedural immunity accorded the government as to the application of the statute of limitations, while this case involves only a question of substantive law.

It is true that the government traditionally is not liable for the torts of its servants any more than it is subject to the statute of limitations. But as it was intended that the government should be liable for the torts of its servants under the federal control of the railroads, we think that it was intended that the usual rules of tort liability should apply, and not some novel and unknown system. As to the application of the statute of limitations, the statute was silent, and the Supreme Court decided that the traditional rule prevailed.

[5] It is, however, further contended that section 10 of the Federal Control Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j),

authorizing suits against the government, provides only "that carriers while under federal control shall be subject to all laws and liabilities *as common carrier*," and that inasmuch as the railroad is not obliged to accept the circus for movement on its rails, it is not acting as a common carrier when affording such service. With this restrictive interpretation of section 10 we are also unable to agree. In our judgment, section 10 was intended to cover all things and acts usually and properly done by common carriers as part of their business, without regard to whether or not, in a specific transaction, they are acting technically as common carriers. If such a restrictive interpretation were applied, many important transactions would be removed from the channels of judicial review; such an intention, in our judgment, is not to be imputed to Congress.

Judgment affirmed.