# Warfield Natural Gas Co. v. Wright.
## Same v. Caines.

(Decided May 31, 1932.)

(As Modified on Denial of Rehearing Dec. 16, 1932.)

DYSARD & TINSLEY, KIRK & WELLS, and B. J. PETTIGREW for appellant.

MARTIN & SMITH for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER
—Affirming.

About 6 o'clock in the evening of October 10, 1929, James Wright, accompanied by Frank Caines, struck a match on the ceiling of the basement of his dwelling. Free gas, whose presence the men did not realize, instantly ignited, set fire to their clothing, and seriously burned them. Suits against the Warfield Natural Gas Company, charging their injuries were due to its negligence, resulted in a verdict for $45,000 in favor of Wright and for $15,000 in favor of Caines.

The basic issues on the trial were whether the gas was natural gas or methane gas, commonly called coal gas, and sometimes marsh gas; if found to be natural gas, whether it had escaped from the defendant's high-pressure pipe line close by; and, if so, whether the defendant had been negligent in relation to its maintenance.

Sharp questions are presented on the appeal as to whether the defendant was entitled to peremptory instructions, and whether the verdicts are sustained by the evidence.

■ The place of the accident was in the village of Beauty, or Himlerville, in Martin county. The house is built on a hillside; the rear of the basement being wholly above the surface and the front of it underground. It contains two large rooms, with an outside door and four windows. Smaller storage rooms are at the front. Wright had moved into this house on Oc-

tober 9, 1929, after it had been closed up for some time. On the next day he cleaned out the basement, having the doors and windows open. He had smelled an odor in there like something rotting, but detected no fumes of natural gas, with which odor he was acquainted through domestic use elsewhere. There was nothing of a combustible nature in the basement. About 4 o'clock in the afternoon, Wright closed the basement and went to his former home to get his chickens. A friend, the appellee Caines, returned with him about 6 o'clock, and Wright took him to the basement to show it to him. He found the electric light globe exhausted, and struck a match on the ceiling. Instantly the men were enveloped in flames, and ran out toward the creek, which they found to be dry. They tore off their burning clothing, but their bodies were horribly burned. There was no detonation—only a thud. A door slammed, but not even a window glass was broken. Neighbors who arrived quickly on the scene put out a little fire in the ceiling of the room, and some burning clothing on a line in the basement was extinguished. The casing of the outside door was smouldering, and, when torn off, there appeared a small "bluish" flame, as of gas, between the concrete wall and door f a c i n g. Through the back yard and garden, within fourteen to twenty feet of the house, ran an eight-inch gas pipe line of the appellant, Warfield Natural Gas Company, carrying twelve million feet of gas daily under a pressure of fifty-two pounds. It had been there about thirty years. When this house was built seven or eight years before the accident, the yard was filled, and this pipe line covered to a depth of seven or eight feet with rock, shale, laminated coal, and soil. No gas was used in the building, and there was no direct connection between it and this pipe line or any other source of supply.

That night, fire tests were made in the back yard. These tests consisted of making a shallow excavation and driving a rod or probe into the ground and applying a lighted match to the hole thus made. Gas exuded from them sufficient to ignite momentarily. During the night the pipe line was uncovered in sections. As that was done, water seeped into the excavations and covered the pipe. According to several witnesses, the line, though rusty, was in good condition save for a hole about the size of a toothpick. It was first plugged with

a wood peg, but later a steel punch was driven in, which increased the hole to about three-sixteenths of an inch. A section of the pipe containing such a hole was produced on the trial and identified as having been taken from the place. According to two witnesses introduced by the plaintiffs, the pipe line was badly corroded, scaley, and, in addition to some little perforations, had a hole in it an inch or more in diameter, and the escaping gas could be seen and heard. But, it should be said, other witnesses and all the circumstances tend to show such testimony to be an exaggeration.

The pipe line lay between Buck creek and the house. For twelve years, mine water, containing sulphur, had been pumped into Buck creek about a thousand feet above this point. The creek was at this time, and often before, dry, and it is contended the mine water seeped into the porous ground to the pipe line, and the evidence is that its acids readily eat holes in and destroy the metal. The plaintiffs contend that natural gas escaping from the defective pipe line percolated through the porous made-ground into the basement of the building. They point to the saturated condition of the yard that night and to the gas flame in the doorway, which was between the point of ignition and the pipe line, and this indicates the gas came from it, since it is shown that the blaze in such instances travels toward the source of supply. One of the two witnesses mentioned testified that the appearance of the surface in the yard indicated the presence of a large leak for an extended length of time.

On the claim that the gas seeped from the pipe line into the basement, its construction is important. The outside and inside walls are of concrete, ten inches thick, and at the rear extend three feet or more in the ground. Back of the basement is another foundation supporting a porch. It and pavements on either side of the house are also of cement. The basement in part had been filled to a depth of two or three feet with gravel, cinders, and sand, and a tongue-and-groove pine floor laid upon it. The defendant introduced proof to show that it would have been impossible for the slight quantity of gas which may have escaped from the hole found in its pipe line, twenty feet from the house, to have percolated laterally through the ground, under the sidewalks and concrete foundations and up

through the floor; and that, if the hole had been as big as the two witnesses for the plaintiffs testified, the gas would long before have risen directly to the surface immediately over the line, been easily detected, and given prominent evidence of the defect. As stated, the pipe line was laid two or three feet below the original surface, and the yard above it and between it and the house had been filled so that the made earth was quite porus, except a coating of clay on top. Appellees say the covering of clay confined the gas and permitted its lateral percolation.

As further negativing the claim that it was natural gas in the house, defendant points out that the building was not damaged and there was no explosion such as natural gas produces. Had it been natural gas, according to experts, the explosion would have "blown the roof off the house." Again, attention is called to the failure of Wright in the afternoon to detect its presence. The color of the flashes produced by lighting the gas in the test holes that night is described by some witnesses as not being that of natural gas, but rather of methane gas; and the "bluish flame" at the doorway was only "presumed" by the witness to be natural gas.

Affirmatively, evidence was heard tending to establish the existence in that part of the country of methane or coal gas, which comes from distintegrating shale, present in vast quantities. This gas is odorless, while natural gas, as expressed by one of the mining engineers, has an odor similar to that of ether or garlic—like that described by Wright to have been in the basement that day. Reference is made to numerous "burning springs" in the community which are said to be of this gas; and one of the plaintiff's material witnesses has for several years used this gas taken from an incased water well as a fuel supply. It had been observed bubbling through the water of Buck creek near the Wright house. Opposing this is evidence that the "burning springs" had ceased years ago when development of the gas field began, and the existence of exuding gas was denied. It was also stated that no one had heard of an accumulation of methane gas in that country igniting or exploding.

Mining engineers, equipped with an approved machine for scientifically detecting the presence of gas in

mines, came to the scene shortly before the trial and long after the old pipe had been replaced, and found gas in small quantities present about the place, including a trace in the basement. The machine, however, did not distinguish the two gases; natural gas being about 80 per cent. methane. From their knowledge and the tests made, these experts stated that the ground in the vicinity is constantly emitting methane gas, and they expressed the professional opinion upon those observations and upon hypothetical questions submitting immediate occurrences and conditions that there was no possibility for natural gas from the defendant's pipe line to have caused the plaintiffs' injuries.

It was proven by defendant that the pipe line was of wrought iron of standard quality and weight, and with a life of not less than fifty years. Some say it will last indefinitely. Where there is exposure to the air, the effect of the mine water is to deteriorate the iron, but, where it is underground, as was this, whatever water may have reached the pipe would have had no deleterious effect. It was further shown that the quantity of gas escaping from the small hole was negligible, and that such a hole had probably existed only a brief time.

On the matter of inspection, witnesses living in the community testified to having formerly seen inspectors frequently on the line, but they had not seen any lately —the time varying from six months to three or four years. On the contrary, the company showed that it had performed this duty regularly and in accordance with accepted methods. A fire test was made by inspectors of an independent company at this point on July 2, 1929—three months before the accident. That test, which is made annually, consists of probing the earth over and about the pipe line every few yards, and then applying a lighted match to the opening. It was proved an annual inspection of this kind is the proper, usual, and sufficient practice of pipe line companies. Walking inspections are made more frequently. It is shown that, if a leak has been in existence for any period of time, or is of much consequence, vegetation is burned and the soil becomes cooked and waxy. The company's superintendent testified to having walked the line at this point within less than a month of the accident. Such an inspection had been made regularly

about once a month, and no indications of a leak at or near this place had been discovered.

The appellees submit that the evidence abundantly sustains the claim that it was natural gas which caused their injuries and that negligence is shown. The appellant with equal vigor argues that the case is merely an inference based upon inference—that it is only an inference that it was natural gas that caused the injury, and that that is based upon the inference that it came from the pipe line; and it argues no negligence was shown on its part in maintaining its line. Upon these points a majority of the court are of opinion that the evidence was sufficient to take the case to the jury and to sustain the verdict.

■ The cases were tried together, but separate instructions identical in form, were given. Instruction No. 1. defined ordinary care and negligence. Instruction No. 2 advised that it was the defendant's duty "to use ordinary care to have and maintain" its pipe line "where it passes through and across and in close proximity to the dwelling house of James Wright, in such condition as to prevent the escape of gas" therefrom into the house, "and to use said degree of care in inspection of its said gas pipe line to discover and remedy defective conditions, if any, therein." Then, the jury was told, "If you believe and find from the evidence that the defendant failed to exercise such care in the maintenance of its said gas pipe line at the place aforesaid and that by reason and as a direct and proximate result thereof natural gas was caused or permitted to escape from said gas pipe line at said place into the house occupied by James Wright, which exploded or caused fire when coming in contact with a lighted match in plaintiff's hand," resulting directly and proximately in his injury and damage, to find for plaintiff as set out in another instruction, unless the jury believed him contributorily negligent.

The substance and effect of instruction No. 3 was that, if the jury believed the explosion was of coal or marsh gas, or that it was caused from any other cause than the ignition of natural gas, transported or handled by the defendant, they should find for the defendant. Instruction No. 4 was to the effect that, if the injuries were believed by the jury to have resulted from the ignition or explosion of accumulated gas, yet they could

not find for the plaintiff, unless they should further believe from the evidence that the gas came from defendant's pipe line and that the "company failed to exercise ordinary care in the maintenance, inspection and repair of its lines and failed to exercise ordinary care to discover said leak."

Appellant offers criticism of instruction No. 2, claiming that, while the jury was told that the defendant's duty was to use ordinary care both in the maintenance and the inspection of its pipe line, yet they were told that it was responsible for resulting damages, if it failed to exercise such care only in its maintenance, thereby depriving the company of the benefit of its evidence proving a reasonable and proper inspection. It is further criticised because not submitting the converse of the conditions under which the appellees were entitled to recover.

We do not regard this instruction prejudicial to the appellant. It placed the duty upon the appellant to use ordinary care to maintain and inspect its pipe line in order to discover and remedy any defective condition. Its liability, however, was placed upon a failure to exercise such care only in its maintenance. The duty to maintain embraces the duty to inspect. The pipe line may have been maintained free of culpable defects without inspection; or it may not have been so maintained, even though inspections were made. If the jury, however, did not consider maintenance to include inspection, then, it seems to us, the defendant secured an advantage instead of suffering a disadvantage.

The converse of instruction No. 2 was contained in instruction No. 4, and it is a familiar rule that all of the instructions are to be read and construed together.

Nor do we find error in rejecting the instructions offered by the defendant. Those which were not in substance given were in effect that, if the jury believed the evidence of the defendant's witnesses, they could not in any event find against it, and they were not far from being peremptory instructions in its favor.

■ It is argued that the verdicts are grossly excessive. The appellee, Wright, was fifty-two years old, and had an expectancy of about twenty years. His earning capacity was $1,400 or $1,500 a year. That

has been totally destroyed. It is pointed out that $45,000 at interest would produce nearly double his annual income and at his death the corpus would be intact. That is an important element of damage, but not the sole basis upon which the verdict rests. Roughly calculating, it is found that $15,000 amortized would cover that single element in this case. But one causing injury to another cannot escape the full consequences. The court properly instructed the jury that they might find for the plaintiff, in addition to that compensating him for the impairment or destruction of his earning power, such a sum as would reasonably compensate him for the mental and physical pain and suffering he had endured and which it was reasonably certain he would endure in the future by reason of and as a direct result of the injury sustained.

The evidence of the injuries which Wright suffered is thus fairly epitomized in appellee's brief. He lost his sight, one eye being burned out and the other having light perception only, the edges of his eyelids were burned off so that he cannot entirely close his lids; the tear ducts do not drain through the internal passages of the eyes but pour out upon his cheeks; wind, light, dust and foreign matter irritate and pain his eyes; flies and insects are attracted to them. The scars upon his face are deep and severe and a constant source of irritation and torment; the growth of his beard and shaving pains and irritates his face, which festers, causing constant suppuration; part of his ears were burned off and a part of his nose; his mouth was so deeply and severely burned as to draw and greatly contract the muscles and flesh; his wrists, hands and fingers are stiff, straight, charred stubs; he has no flexibility at all in his fingers; is unable to dress or undress himself or to attend the functions of nature; without assistance he cannot feed himself; his nights are restless, his sleep broken; most pathetic of all is that his general health is good and the chances are that he will live out his natural expectancy.

It does not appear that this court has hitherto had before it a verdict as large as this, nor personal injuries of as great degree. We have sustained verdicts for loss of a leg in whole or in part, from $15,000 to $20,-000. Southern Ry. Co. v. Dougless, 169 Ky. 360, 183 S.W.

937; C. &. O. Ry. Co. v. Honaker, 190 Ky. 125, 226 S. W. 394; Standard Oil Co. v. Titus, 187 Ky. 560, 219 S. W. 1077; C. &. O. Ry. v. Dixon, 218 Ky. 84, 290 S. W. 1064; Kentucky Traction & Terminal Co. v. Roman's Guardian, 232 Ky. 285, 23 S. W. (2d) 272; Chesapeake & O. Ry. Co. v. Stapleton's Guardian, 223 Ky. 154, 3 S. W. (2d) 209 (reversed on other grounds 279 U. S. 587, 49 S. Ct. 442, 73 L. Ed. 861). In Nashville, C. & St. L. Ry. v. Banks, 168 Ky. 579, 182 S. W. 660, a verdict for $16,500 was sustained for loss of both hands. An award of $20,000 for injuries to the head was held not excessive in Louisville & N. R. Co. v. Mitchell, 173 Ky. 622, 191 S. W. 465. A verdict for $17,500 for injury to the spine was sustained in Louisville & N. Railroad Co. v. Lewis, 218 Ky. 197, 291 S. W. 401. In Louisville & N. Railroad Co. v. Melton, 127 Ky. 276, 105 S. W. 366, 367, 110 S. W. 233, 112 S. W. 618, 32 Ky. Law Rep. 51, 33 Ky. Law Rep. 321, 1042 (rendered when the purchase power of money was much less than now and when other cases were decided), a verdict for $22,000 was held not excessive, where a carpenter suffered fracture of both legs, his ribs and back broken, his body paralyzed from the waist down, his internal organs obstructed, and he had suffered six or eight weeks of intense pain, and was not free of pain thereafter. For somewhat similar injuries to a woman, a verdict for $25,000 was sustained in Mealy v. Ewen, 225 Ky. 117, 7 S. W. (2d) 823. In City of Pineville v. Lawson, 225 Ky. 542, 9 S. W. (2d) 517, an eleven year old boy fell through a hole in a bridge and recovered judgment for $25,000 for injuries resulting in blood poisoning, four years' confinement in bed, and rendering him a helpless cripple, and the claim of excessiveness was denied. In the recent case of Louisville & N. Railroad Co. v. Jolly's Adm'x, 232 Ky. 702, 23 S. W. (2d) 564, where there was a separation of damages for conscious suffering and death by reason of being scalded by steam, a verdict awarding $5,000 for four days' intense suffering and $28,000 additional for death was held not so large as to require its annulment.

The annotations in 46 A. L. R. 1228, treat the subject of excessivenss of verdicts for personal injuries not resulting in death, and collate cases decided between 1916 and 1925. We may note a few of them which are most applicable to the instant case.

For the loss of both arms, a verdict of $85,000 was reduced on appeal to $55,000, in Fried v. N. Y. N. H. & H. Rd. Co., 230 N. Y. 619, 130 N. E. 917. For similar injuries $45,000 was held not excessive in Carlson v. Payne, 150 Minn. 480, 186 N. W. 291. Where a man, having about the same earning capacity as appellee Wright, suffered loss of one arm, injury to his brain, back was broken, cartilage between the vertebræ destroyed, ribs and nose broken, right side and both legs paralyzed, a verdict for $45,000 was sustained in Wilson v. B. & O. Railroad Co. 194 Ill. App. 491. Affirmed 242 U. S. 295, 37 S. Ct. 123, 61 L. Ed. 312. In Thomas v. Otis Elevator Co., 103 Neb. 401, 172 N. W. 53, a verdict for $25,000 was upheld where a twenty-six year old workman, earning $85 a month, had both legs broken, shortened, and stiffened, one arm broken, and several teeth lost. In Meeker v. Union Electric Light Power Co., 279 Mo. 574, 216 S. W. 923, a fourteen year old boy suffered very serious electrical burns of his arms, chest, and abdomen, and a verdict for $35,000 was held not excessive. So, too, was a verdict for $30,000 sustained in Fredericks v. Atlantic Refining Co., 282 Pa. 8, 127 A. 615, 38 A. L. R. 666, where a truck driver, earning $52 a week, had his throat and nasal passages burned, the flesh burned off his right hand, permanently crippling it, both arms burned, and hearing affected. In Eckert v. C. R. I. & P. Railroad Co., 135 Minn. 372, 160 N. W. 1020, where a man earning $28 a week had his right arm paralyzed and atrophied, left leg broken and shortened six inches and permanently stiffened at the hip and knee, fracture of the skull, sight and hearing impaired, he recovered a verdict for $50,000, which was reduced by the appellate court to $35,000. In Elder v. C., R. I. & P. Railroad, 163 Minn. 457, 204 N. W. 557, a verdict for $29,940 was sustained where a thirty-eight year old brakeman, earning $240 to $250 a month, was badly burned, ribs fractured, concussion of brain, injury to spinal cord, and the evidence showed probability of never being able to do heavy manual work again, deformed, and still suffering at the time of trial. In Powell v. Standard Oil Co., 168 Minn. 248, 210 N. W. 55, a verdict for $25,000 was sustained where a man was burned on face, head, eyes, ears, hair, neck, arms, feet, knees, fingers, most of the burns being of a very serious nature and leaving the plaintiff horribly scarr-

ed; strength impaired about 25 per cent. and never to be normal again; and he suffered mental and nervous shock and his ability to resist impaired.

Three more recent cases may be noticed also. In Detroit Taxicab & Transfer Co. v. Pratt (C. C. A. Sixth Circuit) 2 F. (2d) 193, a verdict for $35,000 was held not to be excessive where the evidence tended to show that injuries sustained by a six year old boy would result ultimately in his blindness. Where a railroad employee was scalded by steam and died after two weeks of intense suffering, a verdict for $53,700 was sustained in Looney v. N. & W. Ry. Co., 102 W. Va. 40, 135 S. E. 262, 137 S. E. 756, 48 A. L. R. 806. In Davis v. McCree, 299 F. 142, 143 (C. C. A. 6th Circuit) a verdict for $100,000 for injuries sustained by a female circus performer in a railroad wreck was affirmed and certiorari denied in 266 U. S. 611, 45 S. Ct. 94, 69 L. Ed. 466.

In the light of those judicial precedents, having regard for the power vested in the jury and the limitations upon the authority of a reviewing court, and considering the helpless and pitable condition of the injured man, who sustained a combination of many of the injuries recited in those cases, ought the verdict of the jury be set aside on the ground of excessiveness? It is as a matter of course conceded that his earning capacity has been forever destroyed. The intense physical pain which this unfortunate man has suffered and the discomfort he will continue through the years to suffer cannot be denied. All will agree that no more severe agony can be experienced than that caused by being burned. Indeed, the finite mind of man can conceive none more agonizing, so the punishment to be imposed upon the spirits of the damned is portrayed as an eternal fire.

The plaintiff is entitled to compensation for the psychical as well as the physical pain arising from his experience and the alteration in his body. Distress of mind from the contemplation of his condition and humiliation over a realization that he has become a constant care and a heavy burden are doubtless great. He has been reduced from a strong man, able to meet the world and earn a living for himself and dependent family, and with a capacity to enjoy life, to a seared, suffering hulk, absolutely dependent upon others not

only for sustenance but also for the very act of being fed and requiring the attention of a babe of tender years. He has been suddenly transformed from a mental state of cheerfulness and hope to another of melancholy by day and unrest by night. Mental suffering, recognized by this court when accompanying physical injury as compensable, is no more intangible and indefinite than physical suffering. Neither mental nor physical pain can be weighed. They cannot be measured; they cannot be computed; compensation or damages for them can only be estimated. The difficulty in making the estimate affords no good reason for failing to make it. If compensation be omitted for these elements or either of them, it is not full compensation. The estimation of that renumeration must depend upon the good sense, sound judgment, and enlightened conscience of the jury under all the facts and circumstances of each particular case. Sedgwick on Damages, secs. 43, 44, 47 and 484; Sutherland on Damages, secs. 1242, 1243; Coombs v. King, 107 Me. 376, 78 A. 468, Ann Cas. 1912C, 121; McDermott v. Severe, 202 U. S. 606, 26 S. Ct. 709, 50 L. Ed. 1162; Erie Ry. v. Collins, 253 U. S. 77, 40 S. Ct. 450, 64 L. Ed. 790; Southern Ry. Co. v. Dugless, 169 Ky. 360, 183 S. W. 937; McGee v. Vanover, 148 Ky. 737, 147 S. W. 742, Ann. Cas. 1913E, 500.

The attitude of this court as to amounts of verdicts of a jury is thus recently stated in Nussbaum v. Caskey, 235 Ky. 640, 32 S. W. (2d) 18, 19: "By reason of the variable standard and the necessities of the case, our power to reverse an award of damages for pain and suffering wrongfully inflicted is limited to instances where the amount allowed is so disproportionate to any reasonable consideration of the actual injury that it strikes us at first blush as a passionate, and not a deliberative, judgment of the jury." See, also, City of Paducah v. Konkle, 236 Ky. 582, 33 S. W. (2d) 608; Louisville & N. R. Co. v. Jolly's Adm'x, 232 Ky. 702, 23 S. W. (2d) 564.

Although the verdict awarded appellee Wright is very large, measuring it by the considerations outlined, the court does not regard it as so excessive as to require a reversal of the judgment.

The other appellee, Caines, though less seriously injured, sustained severe and extensive burns upon his

body, head, arms, legs, side, and breast. Part of his nose and ears are burned off. His face is spotted and pitted with scars. He cannot now open his mouth naturally. His hands and fingers cannot be closed normally; one joint being immovable. He cannot dress or attend to himself without assistance. His circulation is poor, and his nerves and general health impaired. There is evidence that he is permanently injured, although his earning capacity has not been wholly destroyed. A doctor says that tenderness, irritations, itching of the scars are permanent conditions. Under the circumstances, we do not regard the verdict of $15,000 in his favor as excessive.

■ Complaint is made that the court committed an error in trying the two cases together, over the objection of the appellant.

In the recent case of Sheetinger v. Dawson, 236 Ky. 571, 33 S. W. (2d) 609, 610, this question was considered and the views of the court thus expressed:

"The practice of trying cases together when they arise out of the same facts and parties are substantially the same is not only proper, but should be encouraged, unless there is objection and it appears that some undue advantage may be obtained by one side or the other by reason of the joint trials. The subject is discussed fully in Benge's Adm'r v. Fouts, 163 Ky. 796, 174 S. W. 510. Other cases on the subject are: Reid v. Nichols, 166 Ky. 423, 179 S. W. 440; Paducah Traction Co. v. Walker's Adm'r, 169 Ky. 721, 185 S. W. 119; Waller v. Lee County, 187 Ky. 848, 220 S. W. 1071; Farrar v. Hank, 205 Ky. 89, 265 S. W. 487; Herndon v. Ky. T. & T. Co., 214 Ky. 36, 281 S. W. 1036."

The prejudicial effect which the appellant says resulted from the joint trial is that the verdict in the Caines case was made larger because of the evidence respecting the more serious injuries sustained by Wright. We are not convinced that the plaintiff's obtained any material advantage by the exercise of the court's discretion in trying the cases together.

The judgment in each case is affirmed.

Whole court sitting, except Judge Willis.

Thomas and Rees, J. J. dissenting.