## Adams v. Sexton.
(Decided Oct. 23, 1936.)

C. G. YAGER and HOWARD VAN ANTWERP, JR., and STAN-LEY B. MAYER for appellant.

WOODS, STEWART & NICKELL for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

At some time after 11 o'clock on the night of January 25, 1935, while riding in a car owned by Sherman Patrick, driven by his son Russell and in which there were three other boys Salyers, Shelton, and appellee, John Sexton was injured, as the result of a collision between the Patrick car and a taxi owned and then operated by appellant, of whom he sought damages.

Three lawsuits grew out of the accident; Sherman Patrick the owner of the sedan, sued Adams for damages resulting to his car, and as next friend of Russell sued for damages on account of his personal injury. These suits were tried together and heard by one jury, which returned separate verdicts. In the Patrick cases it declared: "We the jury find for defendant on plaintiff claim and for plaintiff on defendant counterclaim on account of negligence of both." In the Sexton case the jury said: "We the jury agree and find Russell Patrick and J. L. Adams guilty of negligence and find for John Sexton, in the sum of $1,418.25." In the Sexton case a judgment in conformity with the verdict was entered after motion for a new trial was overruled. This appeal results.

It is insisted that the judgment below should be reversed because (1) the verdict is not supported by the evidence; (2) the amount awarded Sexton by way of damages is excessive; and (3) because of errors in the giving of and refusing instructions, including peremptory for appellant.

Winchester avenue runs east and west through the city of Ashland. In the block between Twenty-First and Twenty-Second streets where the accident occurred, the avenue is about 64 feet wide from curb to curb, with double street car tracks in its center. The tracks and the space between the north and south tracks occupy about 14 feet, leaving a clearance on each side of the tracks of about 24 feet. On the night of the accident there was considerable snow and ice on the streets, all witnesses agreeing that the street surface was very slick.

There is a sharp conflict in the testimony as to how the accident occurred, such a conflict as necessitates a more detailed recital of the evidence than would ordinarily be required.

About 11:30 p. m. on the night in question Russell Patrick driving his father's car, met up with Shelton, and shortly thereafter with Sexton and Salyers. Salyers was drunk, handling his money recklessly and wanting to pick a quarrel with some one, and one of the party suggested that it would be the wise thing to take him home, and Patrick agreed. Salyers got in the front seat with Patrick, Sexton and Shelton taking the rear seat. They drove a short distance, and as we gather from the testimony Patrick drove into Winchester avenue from Seventeenth street and proceeded along the avenue, crossing Twenty-First street. According to Patrick and Sexton, shortly after crossing Twenty-First street, and going about 20 miles an hour, Patrick was forced to make a quick turn to the left to avoid a car which they say was backing out from the south curb at a 45-degree angle, and Patrick says, when he pulled around to avoid the car, his left wheels were on or very near the right rail of the south car track. His left rear wheel seemed to be hanging in between the south rail and the ice which had formed close to it. His front wheel was out, but the rear one was not. Patrick says that as he was attempting to straighten his car back to the right, the "jitney bus cut across the street and hit

me in the left rear end.'' They say the taxi was coming from the opposite direction at 20 to 25 miles per hour. Patrick went partially through the windshield, fell out the door which had been knocked open, and was unconscious for a short while.

Sexton says that just after the Patrick car had crossed Twenty-First street Russell pulled out to avoid the car which was backing out from its parking place at the south curb of Winchester avenue. In doing so the left hind wheel caught in between the ice and rail, and Patrick proceeded along in this manner until he got near the middle of the block. He then cut off his motor and pulled to the right, though his left hind wheel had not cleared the south rail. Here the Adams' car, which he says was ''real close to the Patrick car when I first saw it and was over on our side of the street, and it just come on and hit the Patrick car. We were in the street car track and couldn't get out, and he was on our side of the street.'' Both Patrick and Shelton are insistent that at no time was the Patrick car on the north (or its left) side of the street car tracks or of the south rail.

At the impact Sexton was thrown through a rear window, badly bruised, and was unconscious for two and a half hours. He was taken at once to the hospital, where he received medical attention. Shelton riding in the rear seat with Sexton did not observe much. He says he was talking to Sexton and did not see the car back out. He does say the Patrick car was over on the street car track and he could tell from its movement that there was something wrong with the wheels; that the wheel of the car was caught in the south side of the car track. This witness, though unable to explain how the collision occurred, says that Patrick's car was on the right side of the track. Salyers did not testify for reasons obvious.

The Patrick car showed from inspection that the impact came on the left rear end. An axle was broken, the doors sprung, the bearings torn, and the windshield and two rear windows were broken. The Adams' car was damaged in the front end; the hood knocked loose, fender and wheel injured, as well as the bumper and axle. There appears no discrepancy as to the point of contact, as shown by description of the cars after the accident.

The appellant's version differs radically from that

of appellee and his companions. Adams was alone in his car, going down the avenue westwardly as he says on the right side thereof, at a speed of not more than 20 miles per hour. When he was about 100 feet west of Twenty-Second street, he saw the Patrick car approaching at what he judged to be a rate of about 20 or 25 miles per hour. He says, as the others, that the street was very slick, covered with ice and snow; that, when he first saw the car, "I took my foot off the gas, put my foot on the brake and began to slow down, but they slid into me. I had my foot on the brake when they hit me." He describes the approach of the Patrick car as being "along in the street car track and their car was skidding, and they got to a point on my side of the avenue between my car and some other cars, or a car parked on the north side of the avenue in front of the Suzanne Shop." However, on the map filed upon which he traced the course of the Patrick car from the point where he first observed it to the point of collision, his tracing does not show this to be correct.

There were several cars parked on the north side of the avenue near the point of the collision, all parked at a 45-degree angle, and Adams says that he pulled toward the outside of the north street car track to avoid these, and that about this time the rear of Patrick's car was on the north side of the car track facing southwardly, and while still in that direction, the left rear end of the Patrick car struck his car the impact turning the Patrick car around so that it was then headed northwardly. He says he was at all times on the right side of the north rail of the street car track, and that at the point of collision he was as near the cars parked on the north side of the avenue as he could get.

As far as the record discloses, only one pedestrian claims to have been in a position to see the accident. This witness had crossed the street before the cars struck and was standing on the curb on the south side of the avenue as the Patrick car came up the avenue from Twenty-First street. He says that he first saw Patrick's car as he was crossing the avenue, coming up the south side of the track; that "he was about the end of the Day Market; the back wheels began spinning and that made the car turn a complete circle, about at the bakery." He says the collision occurred on the north side of the avenue "between the rails and the parked cars." This witness did not see the Adams' car until

the cars collided, but says the back end of the Patrick car swung around and hit the front end of the Adams' car.

Other witnesses heard the crash but saw nothing until afterwards, and they describe the position of the two cars. The Adams' car was facing west on the right side of the north track, and the Patrick car was almost opposite it, in between the north and south rails of the car track, with its front headed northwardly, showing that it had been turned around by the impact.

The foregoing recital of what appears to the court to have been the material facts presents a sharp conflict in the evidence, but this makes it none the less a case wherein it was within the province of the jury to determine the weight of the evidence. While it may appear difficult to understand just how the accident occurred in the manner described by appellee and his companions, we cannot escape the conclusion that there was sufficient evidence to justify the court in passing the case to the jury and to sustain the verdict of the jury. It may be that the version of the collision as given by appellee "lacks the element of reason," but we are not called upon to say or determine why this or that may not appear logical, or to reason why the jury should not have determined otherwise; we are to determine the question as to whether or not the verdict is palpably contrary to the evidence. It is not for this court to reverse a judgment because the evidence was conflicting, or that we would or might have made a different finding, or that in our opinion the verdict may appear to be against the weight of the evidence. Nothing short of a conclusion that the verdict is flagrantly against the evidence will give this court authority to disturb it on the ground insisted. Louisville & N. R. Co. v. Curtis' Adm'r, 233 Ky. 276, 284, 25 S. W. (2d) 398; High Splint Coal Co. v. Payne, 243 Ky. 677, 49 S. W. (2d) 539; Warfield Natural Gas Co. v. Wright, 246 Ky. 208, 54 S. W. (2d) 666.

The jury returned a verdict for $1,418.25 against appellant, which it is complained is excessive, not on account of its being the result of passion or prejudice on the part of the jury, but solely because, as is claimed, the proof did not justify such an award.

Sexton at the time of the accident was a young working man earning $18 per week. It is true accord-

ing to his testimony he was in the hospital but a few hours; that he only lost about six weeks from work. His doctors', hospital, and medicine accounts he fixes around $50, and there is little, if any evidence that Sexton will be permanently disabled from performing labor. The physician described multiple lacerations, mainly about the face and neck; a few on the hands; the left ear was torn loose from the base and a deep laceration in the neck one or two inches deep "almost down to the vertebræ," and perhaps a broken rib. The treatment of the ear required plastic surgery, though the operation was not so successful as to bring the ear back to its former normal position. It is lower than the right one, the physician saying that, due to the "jaggedness" of the cut, it had to be reconstructed in the manner described. The converging cuts on both sides of the neck required a great many stitches and left severe scars.

The appellee, testifying in November, 1935, said that he still suffered pain down the back of his neck; that when he works his neck cramps and sometimes his head is numb over his right eye. He also says he loses sleep; is required to resort to the use of sleeping powders. A physician testifying for appellant said he found some scars which "while they disfigure him I can't find anything that would interfere with his earning capacity." He states that the lobe of the ear was attached a little lower than it should have been, but this defect might be corrected by an operation which might be serious, though not dangerous.

The jury heard Sexton testify; they heard his doctor and saw the alleged disfigurement; and it was for the jury to say what would reasonably compensate appellee for his injuries. The amount awarded is not so great as to strike the court at first consideration as being extravagant. In no few cases have we upheld verdicts where the amount was approximately as here, and where the injuries apparently were not of any more serious effect. Hinternisch v. Brewsaugh, 261 Ky. 432, 87 S. W. (2d) 934; Huls v. Dalzell, 252 Ky. 13, 66 S. W. (2d) 28; Miracle v. Cavins, 254 Ky. 644, 72 S. W. (2d) 25.

It is complained that the court should have defined the term "proximate result" as used in instruction No. 1, and that his failure to do so constitutes a reversible error. In the instruction mentioned the court told the

jury that, if appellant failed in doing any of the things set out in the instruction, the doing of which constituted safe driving under the conditions and circumstances, and it believed that such failure was the "direct or proximate" cause of the injury to appellee, it should find for appellee. As noted, the court used in connection with the word "proximate" the word "direct." These words are used synonymously, not alternatively. It is suggested that the court should have said to the jury that "proximate result" means such a result as would flow from a cause which would naturally lead to and produce the result—the collision—without any other new or intervening cause.

Had the court thus, or otherwise, properly defined proximate cause or result, there is little doubt that the jury might have become confused. This court is on record (along with courts of many other jurisdictions) in holding that it is not a reversible error for the trial court to omit to define the word "approximate." See Hobson on Instructions, p. 41, sec. 92 and cases cited; City of Louisville v. Hart's Adm'r, 143 Ky. 171, 136 S. W. 212, 35 L. R. A. (N. S.) 207, and particularly Ray's Adm'r v. Standard Oil Co., 250 Ky. 111, 61 S. W. (2d) 1067. The cases cited by appellant do not in any wise conflict with those supra.

·Finally, counsel contends that the court erred to appellant's prejudice in failing to give his offered instruction No. A. by which he asked that the jury be directed to find for defendant if they should believe from the evidence that Sexton's injuries were caused solely by the negligence of Russell Patrick, the driver of his father's car.

It must be noted. here that we have before us for review only the case of Sexton against Adams, and the record does not contain the proceedings in the cases consolidated with it. In the Sexton case, in answer to a petition charging Adams with negligent operation of his car, appellant merely denied that he was negligent. He did not affirmatively charge appellant or Patrick with negligence. He had the right to amend his answer, even during the trial, but no amendment was offered, hence the only issue in the Sexton case seems to us to have been whether or not the driver of Adams' car was or was not negligent. However this may be, by instruction No. 2 the jury was told that, if they believed that Pat-

rick's negligence was the sole cause of the injury, it should find for defendant. This in our view of the case, preserved all of appellant's rights and defenses. It is also suggested in brief that the verdict was apparently a compromise verdict. It may have been, but nothing is pointed out to us as being indicative of anything done by the jury tending to show irregularity or unusual procedure on the part of the jury in reaching its verdict.

On the whole case we have not had called to our attention, nor have we observed any error which we deem to have been prejudicial to appellant's rights.

Judgment affirmed.