## J. N. Youngblood Truck Lines v. Hatfield.

February 11, 1947.

As extended on denial of rehearing April 25, 1947.

James S. Forester, Judge.

Golden & Lay for appellant.

Hubert F. White and R. L. Pope for appellee.

OPINION OF THE COURT BY JUDGE DAWSON—Reversing.

On the 16th day of November 1944, Lee Hatfield was severely injured in a collision of an automobile, which he was driving, with a truck belonging to appellant. The accident occurred on U. S. 25-E between Middlesboro and Pineville. The Hatfield car was being driven north toward Pineville and the truck south toward Middlesboro. Each party claims the other was on the wrong side of the road.

The jury returned a verdict in favor of Hatfield in the sum of $23,700, which was the full amount claimed. Appellant relies on four grounds for reversal.

1. That its motion for a directed verdict should have been sustained.

2. The damages are excessive and the verdict resulted from passion and prejudice.

3. The instructions given were erroneous and prejudicial.

4. The court permitted the introduction of incompetent evidence.

1. The accident occurred about 6 o'clock p. m. on Saturday. The night before Hatfield had worked at the mine where he was employed and had slept until

about 11:30 a. m.  He ate his dinner and visited an uncle in the neighborhood, returning home about 4 or 5 o'clock p. m.  He then left his home in his automobile to get a girl to stay with his wife.  On the way to get this girl he stopped at a beer garden called ''Pratt's,'' which is located on the west side of highway 25-E, and purchased two bottles of beer.  He drank one bottle and at least one-half of the second bottle, but did not drink all of it.  He was in the beer garden about fifteen or twenty minutes.  He then stopped at a filling station in front of the beer garden for the purpose of getting his car serviced, and then drove on to the highway, crossing it for the purpose of driving north toward Pineville.  His lights were on and he was traveling in second gear at the time of the collision.  On the same side of the highway as Pratt's, and 447 feet from it, there is a tourist camp known as Sharp's Court.  Most of the witnesses agree that the accident occurred approximately 50 feet south of Sharp's Court.  This portion of the highway is straight, but there is a hill some 300 feet toward Pineville from the scene of the accident.  Hatfield says that as he crossed the highway he saw the lights of the truck coming over the top of the hill and that as it came closer it seemed to be on the wrong side of the road.  He estimates the speed of the truck at about 40 or 50 miles per hour.  He further states that when he realized the truck was going to hit him he put on his brakes and had come to a stop when he was struck.  The truck hit his left front fender and wheel, tearing off the left door and running board.  He further states that when the truck struck his car it was about 3½ or 4 feet on the wrong side of the white center line of the highway.

The surfaced portion of the highway at the point of collision is 22 feet wide, and there is a 30 foot parking area in front of the tourist camp.

The truck driver testified he had been driving a truck for about eleven years and had been working for the appellant about six years.  He started from Louisville about 11 or 11:30 a. m.  In describing the manner in which the accident happened he said there is a ''little flat'' before reaching the hill, which is close to the tourist camp, and because he was behind a car in this flat he had to check his speed and shift into third gear to pull the hill.  The tractor which he was driving had a

five forward speed transmission. He says that in third gear it travels about 12 miles an hour; that when he reached the top of the hill he changed to fourth gear and increased his speed to about 18 miles an hour, and then further increased his speed to about 25 miles per hour when he changed to the fifth, or last, gear. About this time he saw the Hatfield car pull out from the filling station at Pratt's. He said Hatfield crossed over to his own side of the road and that he continued to increase his speed until he got within about 100 yards of the car when he saw that the automobile was close to the white line. The car came closer to the white line as it approached him. He took his foot off the accelerator and placed it on the brake, but while he held his foot on the brake he did not push the pedal in until he saw the car come over on his side of the road, when he slowed to about 18 miles per hour. He says the car kept getting closer and did not move back to its own side. He was then getting close to where cars were parked at the tourist camp, applied more pressure to the brake, slowing to about 12 miles an hour, and blew his horn. The Hatfield car attempted to pull back to its own side but it was too late and the car hit the left front of his truck. The impact broke the left front spring of the tractor and knocked the left front wheel against the running board, which caused the wheel to lock. This jerked the steering wheel out of his hands, causing the truck to careen over to the wrong side of the road. He admits that when the truck and car came to a standstill the left front of his truck was across the center line about four or five feet. He estimates the speed of the car at about 30 miles per hour.

The only other witness who testified that he actually saw the collision is a coal miner named Bill Redman who lives on the highway and is a friend of Hatfield's. He testified he was walking along the highway about 100 feet from Pratt's place and saw the cars collide; that they were both on Hatfield's side of the road. He says that when they collided the Hatfield car was 41″ on the right side of the center line; that he measured the distance. He reached the wreck about one and one half minutes after it happened, saw the truck driver and heard him make the following statement: "I thought this boy was going to cut into Sharp's and I started to

pull around to miss him on the other side. This is a mistake I made in trying to run around him." He further says that all of the truck except the right rear wheel of the trailer was across the center line of the highway and that the front end of the truck was some 60″ over the center line. He estimates the speed of the Hatfield car at not over 20 miles an hour, and the speed of the truck at about 50 miles per hour; he says it looked to him like the truck cut straight across into the car, and that he heard no horn. He further says he saw the Hatfield car pull away from the filling station, heard the shift from low to second gear, and that he knows the car was in second gear at the time of the collision; when he reached the wreck he found the car still in second gear and turned off the lights and ignition as soon as he reached it.

Other witnesses testified for the plaintiff, but in the main their testimony relates to the position of the truck and automobile immediately after the collision. All the witnesses seem to agree that both vehicles were in Hatfield's lane at the time they reached the scene of the accident. Also it seems to be established that both north and southbound traffic had to be routed on the southbound lane of the highway because the wreck blocked the northbound lane.

H. F. White, an attorney, testified there was a scratch, or scar, in the asphalt about six or seven inches long, and that this mark was 41″ from the center line of the highway in the northbound lane.

Appellant produced no eye witnesses except the truck driver, but argues that the undisputed evidence concerning the physical facts requires that the judgment be reversed. The sheriff and two state patrolmen were notified immediately after the accident and reached the scene about 20 minutes after it happened. The testimony of the sheriff is somewhat indefinite. He says he saw some "dirt and stuff" on the highway and that it "might" have been in the southbound lane. He estimates that it was 8 or 10 inches from the center line. He saw some skid marks near the center line 5 or 10 inches from it. He also says that when he reached the wreck the Hatfield car was in the northbound lane and that the truck and car were locked together and had to

be pulled apart. The two state patrolmen arrived at the scene together. The patrolman Blanton referred to a map, but because he failed to indicate in the record the points which he was explaining to the jury, his testimony is not of great assistance. The patrolman Stamper is more definite. He says that when he reached the scene the right front wheel of the automobile was within about 18″ of the outside edge of the pavement of the northbound lane; that the left front wheel of the truck was in about the same position. The rear end of the car was pointed more to the center of the road, and the truck was at an angle with the left rear wheel across the line in the southbound lane. He saw some fresh marks on the highway where the collision occurred, and there was a black skid mark in the southbound lane about one foot or 15 inches from the center line. This mark came over the center line of the road into the other lane. He also found a scraped place, or groove, in the pavement, which started about 15″ in the southbound lane and traced this groove across the center line to the left front wheel of the automobile. He admits the wreck completely blocked one side of the road and all traffic was directed around the vehicles in the southbound lane.

It is contended that the uncontroverted physical facts showed that the testimony of the eyewitnesses can not be true and that such testimony must be disregarded. Several cases are cited in support of this contention. It is not necessary that we review these cases since the principles laid down therein are well settled. We must examine the evidence in the case under consideration for the purpose of determining whether it is sufficient to support the verdict of the jury. If it is we may not disturb the verdict. Combs v. Stewart, 301 Ky. 50, 190 S. W. 2d 861.

As we view the evidence in this case it is squarely contradictory. The evidence as to the marks or scars on the highway is conflicting. The only eyewitness to the accident, excepting of course the actual participants, supports appellee's theory. We have no hesitation in saying that the court properly overruled appellant's motion for a peremptory instruction, and that there is ample evidence to support the finding of the jury in so far as the negligence of the parties is concerned.

2. The verdict of $23,700, which was the full amount claimed in the petition, is made up as follows: $20,000 for pain and suffering and permanent impairment of appellee's power to earn money; $2,800 for actual loss of time; $250 for hospital and medical expenses, and $650 damage to automobile. The proof shows that appellee's total medical expense was $220. As to the $650 allowed for damage to the car, it is necessary to point out that the proof for appellee fails to justify this allowance. Appellee testified that the market value of his car immediately before the collision was from $300 to $400, and that he later sold it as junk for $25. Two other witnesses testified that the market value of the car was from $450 to $500 before the accident, and not more than $50 afterwards. This seems to be all the evidence concerning the damage to the automobile.

Prior to the accident appellee was a coal miner and had been engaged in this occupation for about sixteen years. He was 31 years old when injured and had a life expectancy of more than 33 years. The evidence shows without contradiction that he always worked regularly and earned from $250 to $300 per month. At the time he testified he was employed by Dr. Evans, the physician who treated his injuries, and was earning $2 per day. He can do no hard work and his duties include feeding stock, working in the garden, and other light work, but he is unable to work as a farm hand in the field.

Appellee testified that his collar bone was broken, his left leg was crushed and is now smaller and shorter than the right one. He sustained injuries to his head and still has scars on his body. He was confined to the hospital forty-eight days, suffering day and night, and still suffers from pain in his leg and collar bone. Intense suffering lasted from forty-eight to fifty days. He was not able to work at any occupation for nine and one-half months.

Dr. Evans testified that appellee had a broken left leg and collar bone; that there has been good union but poor apposition of the collar bone, and his left leg is shorter and smaller than his right, causing a limp. He further says the appellee is not able to do manual labor or engage in any work which requires lifting, and that

he is from sixty to seventy-five percent permanently and totally disabled.

It is argued that the verdict is the result of passion and prejudice and is excessive. In support of this appellant cites several cases, including Louisville & N. R. Co. v. Lowe, 118 Ky. 260, 264, 80 S. W. 768, 65 L. R. A. 122; Id., 66 S. W. 736; W. M. Riter Lumber Company v. Jordan, 138 Ky. 522, 128 S. W. 596, and Danville Light, Power & Traction Company v. Baldwin, 186 Ky. 683, 217 S. W. 910.

On the other hand, appellee contends that the condition of the pleadings is such that appellant is in no position to say that the verdict was excessive, and that the testimony concerning the nature of the injuries is more than sufficient to justify the amount allowed. Several cases in which we have sustained larger verdicts are cited, including Warfield Natural Gas Company v. Wright, 246 Ky. 208, 54 S. W. 2d 666; City of Pineville v. Lawson, 225 Ky. 542, 9 S. W. 2d 517; Louisville & N. R. Co. v. Lewis, 218 Ky. 197, 291 S. W. 401, and Southern Mining Company v. Childers, 283 Ky. 687, 142 S. W. 2d 995, 131 A. L. R. 315.

The argument concerning the pleadings is based on appellant's answer, the first paragraph of which contains the following language: "The defendant, for answer to the petition filed herein, specifically denies each and every allegation contained in said petition relative to any negligence or liability of this defendant."

It is contended that this language is not a denial of the amount claimed as damages. The answer should have been a denial of all the affirmative allegations of the petition except those specifically admitted. Section 113, Civil Code of Practice. However, the answer denied all allegations relative to liability. This was a denial of the allegations concerning damages. Moreover, the parties treated the allegations of the petition as at issue, and it might well be said that this question was waived because of appellee's failure to raise it in the circuit court at the proper time. See Kentucky & West Virginia Power Co. v. Saulsbury, 231 Ky. 788, 22 S. W. 2d 281; Hardin's Committee v. Shelman, 245 Ky. 508, 53 S. W. 2d 923; Glens Falls Insurance Company v.

Elliott, 223 Ky. 205, 3 S. W. 2d 219, and cases cited therein.

If the verdict of the jury had been confined to the amount the proof justified we would have no hesitation in saying that the verdict is not excessive, but, as indicated above, the instructions permitted the jury to allow, and it did allow, $250 for medical expense, which was $30 more than the proof showed such expenses to be. The instructions also permitted the jury to allow, and it did allow, at least $175 more for damage to appellee's automobile than the evidence showed the damage to be. This makes a total of at least $205 more than the proof justified, and this amount, we think, is too large to be treated as trivial under the rule of de minimis non curat lex.

The amounts allowed were the total amounts claimed in the petition, and it is obvious that the jury completely ignored the proof concerning these specific items. The verdict clearly indicates to us that it is a result of passion and prejudice and is not based on the evidence. If appellee had remitted the portion of the verdict which we deem excessive we would sustain the judgment, but these excessive amounts are too substantial to be ignored, and the case must be reversed for this reason.

Having reached this conclusion it will not be necessary for us to discuss the other grounds relied upon for reversal, but for the benefit of the court on the next trial of the case we point out that we agree with the trial court's ruling with respect to the introduction of the statements of the truck driver which were made in the presence of two witnesses immediately after the accident, since such statements are a part of the res gestae. See Louisville & N. R. Co. v. Foley, 94 Ky. 220, 21 S. W. 866; Louisville & N. R. Co. v. Strange's Adm'x, 156 Ky. 439, 161 S. W. 239, and Cincinnati, N. O. & T. P. Ry. Co. v. Martin, 146 Ky. 260, 142 S. W. 410.

Ordinarily the admissions of an agent are not admissible against his principal, but where such statements form a part of the res gestae the rule is different, and such statements may be admitted. See 20 Am. Jur. page 571, Section 676.

The admission of the driver of the truck to Dr. Evans was admissible for the purpose of contradicting the testimony of the driver, and since the court correctly admonished the jury that this was the only purpose of that testimony, it was not error to admit it.

The instructions are subject to criticism. At the next trial the court should confine the instructions to the general duties of the parties as required by the applicable statute, and recovery should be limited to the actual damage proved.

It is also contended that the trial court erroneously permitted appellee to introduce prejudicial evidence that appellant's home was in North Carolina, and that it operated a large fleet of trucks over Kentucky highways. The pleadings admit that appellant owned and operated the truck involved at the time of the accident, and the testimony in this connection was unnecessary. It could only have been introduced for the purpose of exciting the prejudice of the jury and should have been excluded. Such testimony should not be admitted on the next trial.

The judgment is reversed for a new trial in accordance with this opinion.