Harold FANN et al., Appellants,

v.

Harold McGUFFEY, Commissioner,
Department of Insurance, etc., et
al., Appellees.

Court of Appeals of Kentucky.

June 27, 1975.

As Modified on Denial of Rehearing
Nov. 26, 1975.

Darrell B. Hancock, Peter Perlman, Fowler, Rouse, Measle & Bell, Lexington, for appellants.

Edward L. Fossett, Gen. Counsel, G. Lee Langston, Dept. of Ins., Frankfort, Bert T. Combs, Edward L. Galloway, Edwin S. Hop-

son, Tarrant, Combs & Bullitt, Louisville, for appellees.

Gerald Kirven, Brooks Alexander, Louisville, for American Ins. Ass'n; William L. Martin, Gen. Counsel, New York City, Middleton, Reutlinger & Baird, Louisville, of counsel.

Paul K. Murphy, Theodore S. Mussler, Jr., Murphy & Mussler, James B. Lenihan, Hargadon, Lenihan & Harbolt, Louisville, for amicus curiae (Kentucky Trial Lawyers Ass'n).

Robert D. Preston, Lexington, for amicus curiae (pro se).

PALMORE, Justice.

The plaintiffs in an action challenging the validity of a "no-fault" automobile insurance law[1] enacted by the 1974 General Assembly appeal from a judgment of the Franklin Circuit Court holding it "valid and constitutional in all respects." Except for the standing of the original and intervening plaintiffs to raise some of the issues presented, we concur in the judgment.

After much controversy and parliamentary difficulties the act was put together and adopted in the very last hours of the 1974 session. Understandably, it is not free of ambiguities which must (and can) be ironed out by judicial construction to the extent that they are critical to this or any later judicial inquiry and by legislative amendment otherwise. We express this prefatory caveat to make it clear that our initial construction of what the law in its various aspects means or should mean need not be taken as final and binding unless within the context of this opinion such a construction is necessary to its constitutional survival.

The basic framework of the law is as follows:

1. *Compulsory insurance.*[2]

Except for governmental agencies, every owner of an automobile[3] registered in Kentucky or operated by him in Kentucky[4] must carry or provide insurance covering the payment of (a) tort liabilities for personal injuries (minimum $10,000 per person, $20,000 per accident) and property damage (minimum $5,000) and (b) no-fault "basic reparation benefits" (hereinafter called BRB).[5] An owner or registrant who operates or permits his vehicle to be operated in this state without the required tort liability coverage commits a misdemeanor punishable by fine of not less than $50 nor more than $500.[6]

2. *Benefits and liabilities.*

Regardless of fault, every person suffering economic loss from a personal injury[7] arising out of the maintenance or use of an automobile is entitled to BRB[8] unless he has exercised the option to reject limitation

---

1. Ch. 385 (HB 314), Acts of 1974, carried into the statutes as KRS 304.39–010 to 304.–39–340, incl., and KRS 304.99–050. It becomes effective on July 1, 1975.

2. According to the record in this case some 35% of the motor vehicles now being operated in Kentucky are uninsured.

3. The statutory term is "motor vehicle," defined as a vehicle required to be registered under KRS Ch. 186. KRS 304.39–080(5) and 304.39–020(7). We use "automobile" in that sense throughout this opinion.

4. (Including operation by another with his permission.)

5. KRS 304.39–080, 304.39–090, 304.39–110. Insurance companies doing business in this state are required to include both coverages

in all policies (wherever issued) covering liability arising out of ownership, maintenance or use of an automobile while in this state. KRS 304.39–100(2).

6. KRS 304.99–050.

7. Property damage is not covered.

8. BRB is paid by the insurer of the vehicle occupied by the injured person, or, if he was a pedestrian, by the insurer of the vehicle by which he was struck, or, if neither vehicle had such coverage, by the issuer of any policy under which the injured person is entitled to BRB. KRS 304.39–050. If there is no applicable BRB coverage, payment is made through an "assigned claims plan." KRS 304.39–160.

of his tort rights.[9] On the other side of the ledger, every person who registers, operates, maintains or uses an automobile on the public roadways of Kentucky is deemed, as a condition thereof, to have accepted certain limitations upon his tort rights unless he has filed with the Department of Insurance a written rejection.[10] This is the heart of the no-fault plan.

A rejection of the tort limitations retains undiminished both liability and the right of recovery under tort principles, without affecting the right of one who has not submitted a rejection to recover BRB. That is to say, there is no restriction on the right of an injured claimant who collects BRB to recover the balance of his damages from a culpable defendant who has submitted an unrevoked rejection (the claimant's insurer being subrogated to the extent of BRB paid). On the other hand, one who has rejected the tort limitations has the right to purchase from his insurer, for his own benefit, the same first-party benefits available to those who have not rejected the tort limitations.[11] Though he must in any event carry BRB coverage for the protection of third parties, his rejection does not prevent the purchase of no-fault benefits payable to himself.

As may be seen, the act limits rather than abolishes tort liability, and is a "modified" no-fault law.

3. *Limitations upon benefits and liability.*

BRB is [12] confined to "economic" loss consisting of medical expense, loss of work income, expense for assistance and, in the event of death, funeral expenses not exceeding $1,000 and certain other incidental losses to the survivors.[13] Except for the item of medical expense it is limited [14] to $200 per week and an over-all maximum of $10,000.[15]

Losses of this category in excess of the injured party's BRB are recoverable from the tortfeasor free of any limitation imposed by the no-fault law.[16] Though KRS 304.39–060(2)(a) speaks in terms of "abolishing" tort liability, it is an abolition only in the most technical sense, because in practicality the injured party's right of recovery is enhanced by his entitlement to BRB without proof of fault. From his standpoint, it is only the necessity of proving fault that is abolished, and from the standpoint of the alleged tortfeasor, of course, whatever is abolished in the way of liability is all to the good. Therefore, KRS 304.39–060(2)(a) confers a positive benefit on both parties at no disadvantage at all to either of them.

The rub comes with KRS 304.39–060(2)(b), the next subsection, which is aimed at eliminating the main brunt of small personal-injury claims but undoubtedly will in some instances abolish claims for pain and suffering that are not so small.

KRS 304.39–060(2)(b) provides in substance that in any tort action against the owner, registrant, operator or occupant of an automobile for which the required liability and BRB coverage has been provided, or against a defendant who is responsible for the acts or omissions of such a party, the plaintiff may recover "for pain, suffering, mental anguish and inconvenience because of bodily injury, sickness or disease . . . only in the event" he meets one or more of the following "threshold" conditions:

9. KRS 304.39–030.

10. KRS 304.39–060.

11. KRS 304.39–060(6) and (7), 304.39–140(5).

12. It is less awkward to refer to it in the singular rather than plural.

13. KRS 304.39–020(2) and (5).

14. (Per person, per accident.)

15. KRS 304.39–130, 304.39–020(2). Increased coverage can be purchased. Such coverage over and above BRB is called "added reparation benefits." KRS 304.39–140, 304.39–020(1).

16. KRS 304.39–060(2)(a) "abolishes" tort liability only *to the extent that BRB is payable* (or would be payable in the absence of a policy deduction).

(1) His reasonable medical expenses [17] exceed $1,000 (disregarding exclusions and deductions) or, if he was entitled to and received free medical or surgical treatment, the value of such treatment was at least $1,000;

(2) The injury or disease includes one or more of the following:

   (a) Permanent disfigurement;

   (b) Fracture of a weight-bearing bone;

   (c) A compound, comminuted, displaced or compressed fracture;

   (d) Loss of a body member;

   (e) Permanent injury within reasonable medical probability;

   (f) Permanent loss of bodily function;

or

(3) The injury results in death.

■ This limitation upon recovery for pain, suffering, mental anguish and "inconvenience" [18] does not apply if the plaintiff was not an "owner, operator, maintainer or user" of an automobile. Hence it does not apply to an injured pedestrian unless at the time of the accident he owns or maintains an automobile, or is an operator or user in the sense that upon occasion he drives, uses, or has driven or used an automobile on the roadways of this state.[19] In this special respect, one who "uses" an automobile (e. g., a passenger) is not a "user" unless he is a named insured in a policy with BRB coverage or is covered as a member of the named insured's household.[20] Nor does it apply if either the injured claimant or the person against whom his claim is asserted has rejected it.[21]

■ KRS 304.39–060(2)(a) and (b) lack some degree of clarity, partially because, it is said, subsection (b) was lifted out of context from the Florida statute.[22] Apparently there has been some thought that KRS 304.39–060(2)(b) not only restricts recovery *for* pain, suffering, mental anguish and "inconvenience" but also limits it *to* those items of damage, thus eliminating, for example, the element of destruction or permanent impairment of earning capacity. But we see nothing to call for such a construction. Read carefully in this aspect, the statute says only that unless the threshold requirement is satisfied there can be no recovery of these particular, enumerated elements of damage. If the threshold is met, there is no limitation on the kind or amount of damages recoverable over and above the BRB paid or payable to the plaintiff.[23]

Factual questions vital to a determination of whether and to what extent tort limitations apply in any given litigation must, of course, be raised by the pleadings, and presumably are subject to trial by jury. Which party must plead what, and bear the burden of proving it, is a mundane detail of importance, we suppose, only to judges and practitioners of the art of litigation, since it appears thus far to have escaped attention all around. In the absence of legislative amendment to supply the deficiency it will just have to be hammered out on a case-by-case basis.

---

17. These are defined in KRS 304.39–020(5)(a).

18. We shall not undertake to discuss whether or to what extent "inconvenience" is a permissible element of damages.

19. We leave open the question of how much operation or use will suffice to make one an operator or user who is fully subject to no-fault limitations on his rights of recovery, except to say that a person who has not operated or used an automobile after July 1, 1975, the effective date of the act, could not constitutionally be deemed to have accepted such limitations.

20. See KRS 304.39–020(3)(b) and (4) and KRS 304.39–050(1) for the provisions leading us to this construction.

21. KRS 304.39–060(7) and (8).

22. Fla.Stat. § 627.737(2).

23. The words, "except to the extent noneconomic detriment qualifies under subsection (2)(b) hereof," at the end of KRS 304.39–060(2)(a) are a meaningless appendage, since subsec. (2)(a) does not purport to affect recovery for noneconomic detriment anyway.

#### 4. *Option to reject.*

Any person may reject the limitation of his tort rights and liabilities on a written form prescribed by the Department of Insurance. The natural parent or official guardian may exercise this option for a person under legal disability, but in no event is the person under disability deemed to have accepted the limitation until the expiration of six months from the time the no-fault law would otherwise have become applicable to him.[24] Once filed, a rejection is good for five years from date of its execution but may be revoked at any time.[25] The owner or operator of a motorcycle may separately reject for that particular vehicle, while otherwise accepting the benefits and limitations of the no-fault law.[26]

A person involved in an accident who does not have BRB insurance but does have the required amount of tort liability coverage (KRS 304.39–110) is deemed to have rejected limitation of his tort rights and liabilities for that particular accident.[27]

Provision is made for notice and explanation of the rejection option to all holders of automobile insurance.[28]

#### 5. *Exceptions.*

A person whose injuries arise out of the use or maintenance of an automobile he has converted is disentitled to BRB or added reparation benefits from any source other than an insurance policy under which he has such coverage as an insured.[29] A person injured in the course of attempting intentionally to injure either himself or another person is disentitled to such benefits from any source, as are his survivors if he dies.[30]

#### 6. *Statute of limitations.*

An action for tort recovery not foreclosed by KRS 304.39–060 must be commenced within two years after the injury or death or after the last payment of no-fault benefits, whichever is later.[31] This provision remains subject to KRS 413.170(1), which extends the limitation period for infants and persons of unsound mind. Limitations on actions for no-fault benefits vary from one to four years after the accident or after the last payment of benefits, but are not pertinent to this inquiry except for KRS 304.39–230(5), which provides as follows:

"If a person entitled to basic or added reparation benefits is under legal disability when the right to bring an action for the benefits first accrues, the period of his disability is a part of the time limited for commencement of the action."

#### 7. *Mandatory rate reduction.*

A showcase feature of the act is that for at least one year beginning on July 1, 1975, the rates for minimum bodily injury liability coverage plus BRB and uninsured motorist coverage must be decreased by not less than 10% from the pre-existing rates for the same bodily injury coverage plus uninsured motorist and $1,000 per person medical expense coverage.[32] It is of interest here only because it does not apply to any policy under which a person who would otherwise be entitled to BRB [33] has rejected

---

24. KRS 304.39–060(4).

25. KRS 304.39–060(5).

26. KRS 304.39–060(9).

27. KRS 304.39–060(4). Whether a carload of completely uninsured nonresidents can constitutionally be deemed to accept the no-fault limitations by crossing into this state on one of its highways is a question none of the parties had standing to raise. We leave it to abide the event.

28. KRS 304.39–060(6).

29. KRS 304.39–190.

30. KRS 304.39–200.

31. KRS 304.39–230(6).

32. KRS 304.39–330(1).

33. Since BRB coverage extends to certain members of the named insured's household, cf. KRS 304.39–020(3), this means that the reduction will not apply if any one or more of the persons so covered exercises his option to reject.

the limitations on his tort rights and liabilities.[34]

Almost half the states have enacted no-fault insurance laws of one kind or another. Five courts of last resort have decided constitutional challenges.[35] The Illinois act was declared invalid on grounds not applicable to this case. The personal injury portion of the Florida act was found valid in all respects except for the threshold criteria based on bone fractures, which were held discriminatory.[36] This background information has significance to the controversy now before us only because most of the main issues raised here were discussed and decided in one or more of the other cases.[37] None of them, however, involved the precise question presented by Sec. 54 of the Kentucky Constitution, which reads as follows:

"The General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property."

If the act meets the test of that provision (and we think it does), there can be no serious doubt that Secs. 7 (right of trial by jury), 14 (access to the courts) and 241 (recovery for wrongful death)[38] also are satisfied. If one has no right of action the guaranties of Secs. 7 and 14 can have no application. If, moreover, the Sec. 54 argument is overcome on the theory of implied consent, which obviously is the keystone of the act's validity, then it would seem that the due process and equal protection arguments should fall by the same sword, because a public policy sufficient to justify an implied waiver of one constitutional protection ought to provide an equally reliable basis for the implied waiver of other constitutional protections that are of no higher value in the context of the given circumstances. Hence the focus of our analysis in this case is directed mainly at the Sec. 54 question.

■ At the outset, the implied-consent theory must be recognized for what it is. As in the instance of contracts implied in law vis-a-vis contracts implied in fact, it necessarily stands on fiction rather than fact. But it is not thereby degraded or denigrated, because the venerated fictions of the law have been deliberately created to achieve what is right. The law simply declares that as done which ought to have been done. If implied-consent laws (or, for that matter, any other laws) had to depend on actual notice they could not exist. It seems to us, therefore, that the proper test of such a law is whether under all the circumstances, considering the public purpose sought to be accomplished and the nature and extent of detriment to the individual, it is reasonable for it to presume a consent where none exists in fact.

■ The argument of amicus curiae that the waiver of a constitutional right must be "knowing, voluntary and intelligent"[39] rests, of course, on the premise that the acceptance of no-fault limitations depends on consent implied in fact. As we have said, however, no implied-consent law could survive on that fare. That the right "waived" under an implied-consent law is a constitutional right does not of itself con-

---

**34.** KRS 304.39–330(2).

**35.** See *Pinnick v. Cleary*, 360 Mass. 1, 271 N.E.2d 592 (1971); *Grace v. Howlett*, 51 Ill.2d 478, 283 N.E.2d 474 (1972); *Opinion of the Justices*, 113 N.H. 205, 304 A.2d 881 (1973); *Lasky v. State Farm Insurance Company*, Fla., 296 So.2d 9 (1974); and *Manzanares v. Bell*, 214 Kan. 589, 522 P.2d 1291 (1974).

**36.** 296 So.2d at pp. 20, 21. The Florida law, however, is not based on implied consent.

**37.** (For example, due process, equal protection, access to the courts, and the right to jury trial.)

**38.** Whatever may be the involvement of Sec. 241 in this controversy, it is extremely tenuous.

**39.** Cf. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

jure any special magic.[40] Ordinarily, indeed, consent need be implied only because it *is* a constitutional right. Counsel's notion that the familiar statutes under which a nonresident motorist is deemed to have appointed the secretary of state as his agent for service of process [41] do not involve the loss of constitutional protections might, we suggest, be quickly dispelled by a review of *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877), and its subsequent history. Certainly the protection of an absent nonresident from a personal judgment rests upon the fundamental right of due process guaranteed by the 14th Amendment. If it were not so it would be unnecessary for the law to imply his acquiescence.

"Motor vehicles are dangerous machines, and, even when skillfully and carefully operated, their use is attended by serious dangers to persons and property. In the public interest the state may make and enforce regulations reasonably calculated to promote care on the part of all, residents and non-residents alike, who use its highways. . . . And, in advance of the operation of a motor vehicle on its highway by a non-resident, the state may require him to appoint one of its officials as his agent on whom process may be served in proceedings growing out of such use. . . . The difference between the formal and implied appointment is not substantial, so far as concerns the application of the due process clause of the Fourteenth Amendment." *Hess v. Pawlowski*, 274 U.S. 352, 356–357, 47 S.Ct. 632, 633, 71 L.Ed. 1091 (1927).

Our views in this respect do not reflect a diminished conception of Sec. 54 as applied in *Saylor v. Hall*, Ky., 497 S.W.2d 218 (1973), *Happy v. Erwin*, Ky., 330 S.W.2d 412 (1959), and the earlier opinions they affirm. The statutes considered in those cases did not purport to imply consent of the persons whose rights were affected, and we do not

say here that they could validly have done so.

In *Wells v. Jefferson County*, Ky., 255 S.W.2d 462 (1953), this court held valid, against the contention that it violated Sec. 54, an amendment of our Workmen's Compensation Act [42] providing that an employe is deemed to have accepted the act unless and until he files a written notice of rejection with his employer. There are differences, of course, between that case and this, but the fundamental similarities far outweigh the differences. Those of us who join in this opinion cannot fairly distinguish it or avoid it by declaring it unsound. There is no doubt that much reliance was placed upon its integrity as a guiding precedent by the members of the General Assembly in drafting and enacting the no-fault law.

■ The responsibility of pronouncing life-or-death judgment on a piece of legislation so important as this cannot be discharged by any exercise of legal virtuosity. It would be all too easy to tear it down and look brilliant in the execution, but it is the duty of the court to save it if possible, and not to condemn it if there is a reasonable doubt of its unconstitutionality. Cf. *Harbison v. George*, 228 Ky. 168, 14 S.W.2d 405, 406 (1929). We resolve any such doubt in its favor.

As one of the briefs suggested, the arguments have tended to obscure the fact that from the standpoint of what the individual gives up, this really is a rather innocuous law. The compulsory insurance aspect, about which there seems to be no legal question, is likely to rip off more skin than the limitation of tort rights. Considering the modest extent to which the scope of tort recovery is constricted, the no-fault law gives much more to the many than it takes from the few.

---

**40.** That the scope of any specific constitutional privilege is defined by the values it was intended to protect is made clear in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

**41.** Cf. KRS 188.020.

**42.** Ch. 82, Acts of 1952, now KRS 342.395.

The object of our sharpest concern is the impact of the law upon infants and other persons under disability, but in this respect a misplaced emphasis has been placed on the right of rejection. The argument that a parent waives his child's right to sue by failing to exercise the right of rejection for him misses the point that it is the child's act in using an automobile, or the parent's act in causing or permitting him to do so, that subjects him to the limitations imposed by the no-fault law. As expressly stated in KRS 304.39–060(1), implied consent to the law hangs on one's use of the highways, not on the failure to reject, which really is in the nature of an added attraction.

Parents and custodians of persons under disability necessarily have the liberty to exercise or forego many options affecting the rights and welfare of the child or ward. A next friend may file suit for an infant, waive trial by jury, and lose the case, all without let or hindrance.[43] What he can or cannot do depends very largely on the gravity and likelihood of harm to which the child is thereby exposed. In the field of criminal law much protection has been thrown about the juvenile, but the policy considerations there cannot reasonably be equated with those involved in this case. Usually, parents can be depended upon to do what they think best for their children, that being the generally reliable instinct of mankind. Considering the no-fault benefits that are disclaimed by a rejection, who is to say whether its exercise in a child's behalf gives him more or takes more from him?

This point was settled in the context of the workmen's compensation law by *Greene v. Caldwell*, 170 Ky. 571, 186 S.W. 648, 653 (1916). Since that time the rights of children have come to be regarded with far greater solicitude, but it is still a prerogative of the state to define the authority of a parent to act for a child.

Being of the opinion that a state's undoubted authority to place conditions upon the use of its highways includes the power to require liability insurance and the acceptance of a no-fault system of loss distribution, we do not regard the option to reject as indispensable to the legal presumption that any person, *sui juris* or not, who uses the highways accepts those conditions, particularly in view of the obvious benefits to himself. Whether the option to reject is exercised does not involve the waiver of a constitutional right. If, on the other hand, the law did not provide for its exercise in some manner for a person under disability there might be real cause for a claim of discrimination.

Heretofore our statutes of limitation have been extended to permit one who is a minor when a right of action accrues in his behalf to bring suit within the same period of time after he reaches his majority.[44] To the extent that KRS 304.39–230(5) may provide otherwise it is claimed to be invalid. There is no authority, however, for a conclusion that such a saving provision is a constitutional necessity. It is a matter of legislative choice.

Aside from the Sec. 54 question, enough has been written by other courts on the due process and equal protection issues raised by this type of legislation to obviate any need for further extension here. We could add nothing to the fine opinions of Mr. Justice Reardon in *Pennick v. Cleary*, 360 Mass. 1, 271 N.E.2d 592 (1971), and Chief Justice Fatzer in *Manzanares v. Bell*, 214 Kan. 589, 522 P.2d 1291 (1974). Suffice it to say that in our opinion these constitutional protections are not violated.

The brief for appellee Kentucky Association of Trial Attorneys contends that the act does not apply to motor vehicles engaged in the transportation of persons for hire, and thereby violates Const.

---

**43.** So may an infant's personal injury claim against a city be lost by failure of someone to give the notice required by KRS 413.170.

*Galloway v. City of Winchester*, 299 Ky. 87, 184 S.W.2d 890 (1944).

**44.** KRS 413.170(1).

Sec. 59, which forbids special legislation where a general law can be made applicable. This argument is based on the exclusion contained in KRS 186.020. Such vehicles are, however, covered by KRS 186.050,[45] so in fact they are not excluded. The same constitutional point is made with reference to KRS 304.39–080(4), which excludes governmental agencies from the compulsory insurance requirement. This is not an unreasonable classification and therefore does not offend Sec. 59.

■ The brief for *amicus curiae* American Insurance Association suggests that none of the complaining parties had standing to litigate the rights of nonresident motorists and workmen's compensation carriers. We agree.

■ In conclusion, it should not escape the attention of any of the litigants and other persons and parties interested in this case that essentially, much of the argument has amounted to little more than a questioning of the public policy on which the General Assembly based its action. It is elementary that the legislative branch of government has the prerogative of declaring public policy and that the mere wisdom of its choice in that respect is not subject to the judgment of a court. To those who may think, for example, that this law does not rest on considerations of policy comparable with those underlying the workmen's compensation law, the answer is that the question has been settled by the only body having the legal right to make that judgment.

Nothing we have said here is intended to leave an inference that those of us joining in this opinion actually doubt the wisdom or soundness of the legislative action. The General Assembly has faced up to the responsibility, never easy under a constitution adopted before the day of carnage on the highways, of adapting the law to the exigencies of the 20th century. It is difficult for us to believe that those great men,

conservative as they were, who labored so diligently in bringing forth that constitution, but nevertheless misjudged the efficacy of the amendment process, would really have it otherwise.

To the extent that it resolves issues the parties had no standing to raise, the judgment should be modified. As so modified it is affirmed.

All concur except for JONES, LUKOWSKY and STERNBERG, JJ., who dissent.

REED, Chief Justice (concurring).

I concur in the majority opinion because I am unable to make an honest intellectual distinction between the constitutional construction made by this court in *Wells v. Jefferson County,* Ky., 255 S.W.2d 462 (1953), and that made by the majority opinion.

The *Wells* decision squarely held that Sections 54 and 241 of the Kentucky Constitution were not offended by our present Workmen's Compensation statute which presumed acceptance of the Workmen's Compensation Law by an employee's failure to reject where an opportunity for affirmative rejection was afforded. In all frankness, I seriously question the correctness of that decision, but I am not prepared to declare the entire Workmen's Compensation Law unconstitutional in view of the reliance placed on the decision. Although I am mindful of the judicial oath to support the Constitution of this State regardless of personal judgments concerning the wisdom of some of its provisions, I am, nevertheless, also so influenced by the legal principles of stability and predictability of judicial constitutional constructions that I am unable in this case to ignore a constitutional construction made by this court and on which affected parties, including the legislature, should be able to rely.

I am also impressed that by reason of the breadth given to state power in attempting to control conditions on its highways there

45. Cf. *Reeves v. Deisenroth,* 288 Ky. 724, 157 S.W.2d 331, 138 A.L.R. 1493 (1941).

is ample policy reason in the instant case to obey and respect the constitutional construction made in the Wells case.

My brother, Sternberg, has filed a separate dissenting opinion in which he undertakes to distinguish the *Wells* case. In my opinion the attempted distinction confirms rather than weakens my conclusion. In the *Wells* case, the question was whether a waiver of constitutional rights may be effected by means of the failure of the employee to elect affirmatively to retain those rights. Justice Sternberg appears to draw the distinction that Wells presented a case between contracting parties. The present statute deals with a contract of insurance. I utterly fail to see any distinction in the applicable principle. Furthermore, Justice Sternberg's dissent adopts the position that the operation of motor vehicles on public roads is a privilege rather than a right. This distinction has been recently, repeatedly rejected by the United States Supreme Court. The proper use of a highway has today become as much of a right as is the right to earn one's living. Therefore, I am unable to follow this line of reasoning.

I join in the majority opinion only with the distinct understanding, however, that the wisdom of the applicability of the Wells doctrine to other areas is under serious scrutiny by this court as presently constituted, and any reliance upon that doctrine in other areas might turn out to be misplaced so far as I am concerned. It is useless, however, to speculate further in this regard because courts only speak when properly spoken to in the context of a contested case.

LUKOWSKY, Justice (dissenting).

Today, the majority eviscerated Sections 14 and 54 of the Constitution of the Commonwealth of Kentucky with the scalpel of judicial fiat. The importance of this necropsy makes it necessary that I publicly express my views.

KRS 304.39–060 provides, in part:

"(2)(a) Tort liability with respect to accidents occurring in this commonwealth and arising from the ownership, maintenance, or use of a motor vehicle is 'abolished' for damages because of bodily injury, sickness or disease to the extent the basic reparation benefits provided in this subtitle are payable therefor, or that would be payable but for any deductible authorized by this subtitle, under any insurance policy or other method of security complying with the requirements of this subtitle, except to the extent noneconomic detriment qualifies under subsection (2)(b) hereof.

"(b) In any action of tort brought against the owner, registrant, operator or occupant of a motor vehicle with respect to which security has been provided as required in this subtitle, or against any person or organization legally responsible for his acts or omissions, a plaintiff may recover damages in tort for pain, suffering, mental anguish and inconvenience because of bodily injury, sickness or disease arising out of the ownership, maintenance, operation or use of such motor vehicle only in the event that the benefits which are payable for such injury as 'medical expense' or which would be payable but for any exclusion or deductible authorized by this subtitle exceed one thousand dollars ($1,000), or the injury or disease consists in whole or in part of permanent disfigurement, a fracture to a weight-bearing bone, a compound, comminuted, displaced or compressed fracture, loss of a body member, permanent injury within reasonable medical probability, permanent loss of bodily function or death. Any person who is entitled to receive free medical and surgical benefits shall be deemed in compliance with the requirements of this subsection upon a showing that the medical treatment received has an equivalent value of at least one thousand dollars ($1,000).

"(c) Tort liability is not so limited for injury to a person who is not an owner, operator, maintainer or user of a motor

vehicle within subsection (1) of this section.

"(3) For purposes of this section and the provisions on reparation obligor's rights of reimbursement, subrogation, and indemnity, a person does not intentionally cause harm merely because his act or failure to act is intentional or done with his realization that it creates a grave risk of harm.

Section 14 of the Constitution of the Commonwealth of Kentucky provides:

"All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

Section 54 of the Constitution of the Commonwealth of Kentucky provides:

"The General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property."

In *Ludwig v. Johnson,* 243 Ky. 533, 49 S.W.2d 347 (1932) we said:

"It was the manifest purpose of the framers of that instrument (the constitution) to preserve and perpetuate the common law right of a citizen injured by the negligent act of another to sue to recover damages for his injury. The imperative mandate of section 14 is that every person, for an injury done him in his person, shall have remedy by due course of law."

"It is insisted that this section of the Constitution (54) does not guarantee the continuation of the right of action theretofore existent, but merely applies to such causes of action as continue to exist, and prohibits the Legislature from limiting the amount of damages to be recovered for injuries resulting in death or for injuries to person or property so long as a right of action exists for such injuries, but does not prohibit it from abolishing the right of action."

"When that section is read in connection with other sections of the same instrument, such as sections 14 and 241, the conclusion is inescapable that the intention of the framers of the Constitution was to inhibit the Legislature from abolishing rights of action for damages for death or injuries caused by negligence."

In *Saylor v. Hall,* Ky., 497 S.W.2d 218 (1973) we said:

"Our state Constitution, however, has been held to prohibit the legislative branch from abolishing common-law rights of action for injuries to the person caused by negligence or for death caused by negligence."

On numerous occasions we have indicated the importance of a person's right to recover damages for pain and suffering. See, e. g., *Ashland Coca Cola Bottling Co. v. Brady,* 252 Ky. 183, 66 S.W.2d 57 (1933); *Warfield Natural Gas Co. v. Wright,* 246 Ky. 208, 54 S.W.2d 666 (1932). In *Ashland-Coca Cola,* supra, we felt compelled to state:

"The right to recover of a wrongdoer compensation or allowance looking toward recompense for pain and suffering caused by him has been everywhere recognized as a fundamental and cardinal principle of law, because it is naturally connected with all physical injuries and must be considered as a direct and proximate result."

It is, therefore, as obvious as a "purple cow" that the Kentucky Motor Vehicle Reparations Act abolishes the tort action for pain and suffering for most accident victims in minor accident cases and is, consequently, unconstitutional unless these victims may be construed to have consented to the application of the Act and waived their constitutional rights.

The method by which this consent or waiver is obtained is the following language from KRS 304.39-060.

"(1) Any person who registers, operates, maintains or uses a motor vehicle on the public roadways of this commonwealth shall, as a condition of such registration,

operation, maintenance or use of such motor vehicle and use of public roadways, be deemed to have accepted the provisions of this subtitle, and in particular those provisions which are contained in this section."

A person who wishes to retain his right to sue may do so only by affirmatively complying with the further provisions of KRS 304.39–060.

"(4) Any person may refuse to consent to the limitations of his tort rights and liabilities as contained in this section. Such rejection must be in writing in a form to be prescribed by the department of insurance and must have been executed and filed with the department at a time prior to any motor vehicle accident for which such rejection is to apply. Such rejection form together with a reasonable explanation thereof shall be furnished by the reparation obligor with each policy to each prospective insurance applicant. Such rejection form shall affirmatively state in bold print that acceptance of this form of insurance denies the applicant the right to sue a negligent motorist unless certain requirements contained in the policy of insurance are met. Rejection by a person who is under legal disability shall be made on behalf of such person by his legal guardian or his natural parent. The failure of such guardian or a natural parent of a person under legal disability to file a rejection, within six (6) months from the date that this subtitle would otherwise become applicable to such person, shall be deemed to be an affirmative acceptance of all provisions of this subtitle. Provided, however, any person who, at the time of an accident, who does not have basic reparation insurance but has not formally rejected such limitations of his tort rights and liabilities and has at such time in effect security equivalent to that required by KRS 304.39–110 shall be deemed to have fully rejected such limitations within meaning of this section for that accident only.

"(5) Any rejection must be filed with the department of insurance and shall be for a period of five (5) years from the date of its execution unless revoked in writing. A copy of such rejection or revocation must be filed with each insurance company providing an automobile policy under which the individual is a named insured as defined in the policy."

The argument is that we have approved the use of such a system of implied consent, acceptance and waiver of constitutional rights by holding the implied consent doctrine constitutional in relation to KRS 186.-565, which provides that a person's driver's license may be revoked if he refuses to take a chemical test to determine the alcoholic content of his blood, breath, urine or saliva after he has been arrested for allegedly driving while under the influence of intoxicating beverages, *Craig v. Commonwealth*, Ky., 471 S.W.2d 11 (1971), and in relation to KRS 342.395, which provides that an employee, as a part of his contract of hiring, shall be deemed to have accepted all the provisions of the Workmen's Compensation Act and be bound thereby unless he shall have filed written notice to the contrary with his employer, *Wells v. Jefferson County*, Ky., 255 S.W.2d 462 (1953).

*Craig*, supra, is inapposite since it does not involve an implied consent to the waiver of basic constitutional rights specifically delineated in the constitution. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

*Wells*, supra, does not control the situation presented here. The provision in the Workmen's Compensation Act withstood attack only because it was aimed at eliminating the workman's difficulty of proof of acceptance of the provisions of the act. The statute affected only the peculiar relationship of employer and employee by providing that acceptance of the act was a condition of the contract of hiring unless written out of the contract. It is notorious that every contract of hiring involves on both the part of the employer and employee a discussion of wages, hours, fringe bene-

fits, terms and conditions of employment. In fact, these very matters are now, in the majority of cases, the subject of collective bargaining with labor unions and employers associations on a unit and even industry-wide basis. *Dick v. International Harvester Company,* Ky., 310 S.W.2d 514 (1958). While the rights involved are the same, the antecedent contractual nature of the relationship between tortfeasor and victim and the bargaining process restrict the applicability of *Wells,* supra, to the field of workmen's compensation.

Persons who are under legal disability comprise a substantial part of the population of the Commonwealth of Kentucky.[1] These persons are covered by the Act unless its provisions are rejected by his legal guardian or his natural parent and any failure of rejection for a period of six months is deemed to be an affirmative acceptance of the Act. This permits one person to waive specific constitutional rights of another person without the advice or consent of a court. Constitutional rights have always been cherished rights and neither the workmen's compensation act nor the statute dealing with a chemical test for alcoholic content in the blood allows one person to waive the constitutional rights of another. In addition, the rights of persons under legal disability have always been carefully protected by our law. For example, the statute of limitations with respect to any cause of action does not begin to run against a person under a legal disability until the disability is removed. KRS 413.-170. Thus, if a child of age eight is injured by some negligent person the period of one year, KRS 413.140(a), in which he has to bring suit against the negligent person does not begin to run until the child reaches the age of legal majority. The child is protected until either he is old enough to make his own decision about whether to bring suit or, if suit is brought earlier in his behalf by a guardian or next friend, its prosecution and settlement is supervised by a court.

It is a fact of judicial history that from 1953 to date there has been an increasing concern for the protection of fundamental constitutional rights. The Supreme Court of the United States in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, illuminated and eliminated the evils of the implied acceptance, implied consent, implied waiver approach when it said:

"Such an approach, by presuming waiver of a fundamental right from inaction, is inconsistent with this Court's pronouncements on waiver of constitutional rights. The Court has defined waiver as 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466, 146 A.L.R. 357 (1938). Courts should 'indulge every reasonable presumption against waiver,' *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed. 1177, 1180 (1937), and they should 'not presume acquiescence in the loss of fundamental rights.' *Ohio Bell Tel. Co. v. Public Utilities Comm'n,* 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093, 1103 (1937). In *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962), we held:

'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver.' Id., at 516, 92 S.Ct. 2182, 8 L.Ed.2d at 77.

"The Court has ruled similarly with respect to waiver of other rights designed to protect the accused. See, e. g., *Miranda v. Arizona,* 384 U.S. 436, 475–476, 86 S.Ct. 1602, 1628–1627, 16 L.Ed.2d 694, 724, 10 A.L.R.3d 974 (1966); *Boykin v.*

---

1. The 1970 Federal Census discloses that of Kentucky's population of 3,219,311 there were 1,114,042 persons under the age of 18 years. Kentucky's Department for Human Resources reports that during fiscal year 1974 8,179 persons were determined to be incompetent in judicial proceedings.

*Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)."

To those who would attempt to construct an artificial distinction between criminal vis-a-vis civil constitutional rights it is enough to say that the constitutional rights of persons who have conducted themselves so as not to be charged with a crime are also worthy of protection.

To apply a different standard here would, by implication, authorize the legislature to write a statute which would abolish or limit recovery in actions for medical and legal malpractice via an implied waiver based upon the failure of the patient or client to notify the physician or lawyer and the hospital or courthouse and the Director of the Department of Health or the Chief Justice of his rejection of the provisions of the act and place our "nihil obstat" on the Good Samaritan Act, KRS 411.148.

To the argument that the doctrine of implied consent is supported by the constitutionality of the Non-Resident Motor Vehicle Operator's Act, KRS 188.020, the Long Arm Statute, KRS 454.210, and similar legislation, suffice it to say that those Acts open rather than close the courthouse door.

The implied consent, implied acceptance, implied waiver doctrine does not meet constitutional standards. Consequently, the entire Act is unconstitutional and void. KRS 304.39–340(2).

I would reverse the judgment of the Franklin Circuit Court and remand the cause for the entry of judgment consistent herewith. The majority having reached a contrary conclusion, I respectfully dissent.

JONES and STERNBERG, JJ., join in this dissent.

STERNBERG, Justice (dissenting).

The majority opinions which uphold the constitutionality of the no-fault insurance law are dangerously bottomed on the case of *Wells v. Jefferson County, Ky.,* 255 S.W.2d 462. Undoubtedly, much has been written and much more could be written eulogizing the Kentucky Constitution and deriding its unsavory mastication. Regardless of my strong feelings in that respect, it is not my purpose at this time to do either. It is only my wish to analyze the Workmen's Compensation Act in its relation to employer and employee; to analyze the effect of the 1952 amendment which gave rise to the *Wells* case, supra; and to analyze the true legal issue which it presented and determined. *Wells* does not constitute an unsurmountable obstacle which shields no-fault from a successful constitutional attack.

To get to the real issue in *Wells,* we must consider the purpose of workmen's compensation. In *Morrison v. Carbide,* 278 Ky. 746, 129 S.W.2d 547, in discussing the purpose of the Workmen's Compensation Act, we said:

"For a proper understanding of the questions presented for determination it is necessary to look not only to the express provisions of the compensation law but to the causes that led to its enactment, its spirit and purposes and the ends sought to be attained. A lengthy discussion of those matters would be mostly unnecessary restatement of a subject already thoroughly covered by courts and text writers. It is sufficient to say that our compensation law is neither cumulative nor supplemental to the common law with respect to personal injuries growing out of industrial occupations. It practically abolished the common law relating to the subject of tortious liability as between the employer and the employee and that abolition carried with it the harsh and as often applied, inhuman rules of assumed risk, fellow servant and contributory negligence which an old school of thought and economics had engrafted into the common law. It was in effect a compromise between the employer and the employee to avoid the expense, vexatious delay and uncertainty of actions at law; and for its superior advantages to them, both surrendered some rights under the common law. However, it was

enacted not only for their benefit but in the public interest since the costs of maintenance of courts fell upon the public and the injured, indigent employee and his dependents often became public charges. Under the modern, more humane and enlightened conception, growing out of the long controversy and thought, and embodied in the act, liability is no longer dependent upon negligence, tortious conduct, contributory negligence or assumed risk, but as between an employer and employee who bring themselves within the terms of the act, the former, however blameless he may be, is nevertheless liable to the employee for accidental injury arising out of his employment. By the act the state has declared a public policy the wisdom of which is no longer a matter of doubt. It provides a method of speedy, inexpensive determination of the rights and liabilities as between the employer and the injured employee who come within its provisions and clearly bespeaks a purpose and intention to make the method and procedure prescribed exclusive."

We must bear in mind that prior to the 1952 amendment the contract of employment between the employer and the employee included as a part and parcel of the contract the workmen's compensation law only, and only, if the employee in writing accepted the provisions of the Act. The 1952 amendment made the Workmen's Compensation Act part and parcel of the contract of employment unless, and only unless, the employee in writing rejected the Act. The law considers the employer and the employee as dealing at arms length. The employer can hire on terms and conditions which make the Workmen's Compensation Act a part of the contract of employment. The employee can accept employment on the terms and conditions that make the Workmen's Compensation Act a part of the contract or he can refuse such employment. By acceptance of work the employee makes all of the provisions of the workmen's compensation statute a part of his contract of employment.

In *Wells*, supra, we said:

" * * * The question now before us is whether a waiver of the constitutional rights may be effected by means of the failure of the employe to elect affirmatively to retain those rights."

In other words, in effect we said in *Wells* that the question before us was whether a waiver of the constitutional rights may be effected (in the contract of employment) by means of the failure of the employee to elect affirmatively to retain those rights. By *Wells* this court made the Workmen's Compensation Act a part of the contract of employment, which thereby contained a waiver of constitutional rights, unless the employee by a writing elected to retain them.

In the case at bar, there is no contract between the Commonwealth of Kentucky and any one relative to the use of Kentucky highways. The operation of a motor vehicle on the highways of this Commonwealth is a privilege and not a right. *Sturgill v. Beard*, Ky., 303 S.W.2d 908; *Commonwealth v. Mitchell*, Ky., 355 S.W.2d 686. The state is not without limitation, however, even in the exercise of its police power in controlling the use of its highways. In *Commonwealth v. Mitchell*, supra, we said:

"Our court has likewise held that to operate a motor vehicle on a public road is not a natural or unrestricted right but rather is a privilege granted by the statute and subject to reasonable regulation under the police power of the state. * * * "

It will serve no useful purpose to further delineate the distinction in the case at bar from the *Wells* case. The difference is apparent.

As I read the majority opinions, in the absence of *Wells* this court would be constrained to say that the provisions of the no-fault insurance law run afoul of our constitution. The Commonwealth, as well as its citizens, is limited by the constitution;

and without *Wells* as a shield, it could hardly be contended that no-fault is constitutional.

I have great fear and much misgiving of the impetus that the majority opinions in this case will give to other and similar-type legislation, controlling by implied consent each and every profession, calling, or endeavor. To me, the encroachment of implied consent into our judicial philosophy is a monster, so great that its disastrous effect is unpredictable.

Be it ever remembered that the majority opinions of this court upholding the constitutionality of the no-fault insurance law came about through no fault of the writer of this dissent.

I have unequivocably concurred in the minority opinion which was written by Justice Lukowsky, and still do; but having such deep apprehensions of the results of implied consent philosophy being injected into legal jurisprudence, I feel it necessary to write this separate dissenting opinion.